# IN THE SUPREME COURT OF IOWA

No. 08–0180

Filed July 1, 2011

JOHN PAVONE and SIGNATURE
MANAGEMENT GROUP, L.L.C.,

Appellees,

vs.

GERALD M. KIRKE and WILD ROSE
ENTERTAINMENT, L.L.C.,

Appellants.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Arthur E. Gamble, Judge.

The owners and operators of a casino appeal from an adverse district court judgment entered against them on a contract claim. **COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Mark McCormick, David Swinton, and David W. Nelmark of Belin McCormick, P.C. (trial and appellate counsel), Des Moines, Brent B. Green and Mariclare Thinnes Culver of Duncan, Green, Brown & Langeness (appellate counsel), Des Moines, and Thomas D. Waterman (until withdrawal) of Lane & Waterman LLP (appellate counsel), Davenport, for appellants.

Maurice B. Nieland of Rawlings, Nieland, Killinger, Ellwanger, Jacobs, Mohrhauser & Nelson, L.L.P., Sioux City, Stanley E. Munger and Jay E. Denne of Munger, Reinschmidt & Denne, L.L.P., Sioux City, and Glenn L. Norris of Hawkins & Norris, P.C., Des Moines, for appellees.

**WIGGINS, Justice.**

A district court jury determined the owners and operators of a casino breached a management agreement and awarded damages to the prospective management team. The owners and operators appealed the verdict. We transferred the case to the court of appeals. The court of appeals reversed the judgment of the district court. On further review, we find the district court did not commit any error in the trial of the matter. Accordingly, we vacate the decision of the court of appeals and affirm the judgment of the district court.

## I. Facts.

In 2003 John Pavone returned to Iowa with the intent to manage casinos through his company, Signature Management Group, L.L.C. (SMG). Pavone had extensive experience in the gaming and hospitality/hotel industries. At about the same time, Gerald Kirke and Dr. Michael Richards formed Wild Rose Entertainment, L.L.C. (Wild Rose), with the intent to obtain gaming licenses, and subsequently, develop and own new casinos throughout Iowa. Prior to forming Wild Rose, Kirke and Richards had no experience in the gaming industry.

On April 29, 2004, Pavone entered into a consulting agreement with Wild Rose to assist Wild Rose in obtaining gaming licenses in the counties surrounding the Des Moines area. The consulting agreement also provided, if Wild Rose obtained a gaming license, Wild Rose would engage in good faith negotiations with SMG for SMG to manage the newly developed casino. Thus, with Pavone's assistance, Wild Rose turned its focus to obtaining gaming licenses in the state of Iowa.

One city that was interested in providing gaming was the city of Ottumwa. On July 15, Pavone sent an email to Kirke asking to meet with him and discuss their future business relationship should the

Ottumwa nonprofit organization seeking the license choose to collaborate with Wild Rose. Subsequently, on July 19, Pavone met with Kirke and Richards at a restaurant Kirke owned, and they discussed SMG's future business relationship with Wild Rose. Pavone claims that at this meeting the parties generally agreed SMG would manage all casinos Wild Rose operated. Kirke admits the parties discussed an eventual partnership but claims the specific terms of an agreement were not discussed.

After this meeting, Pavone met with his attorney, Ryan Ross, and instructed him to contact Wild Rose's attorney, Jim Krambeck, about memorializing the parties' agreement. Subsequently, on July 28, Ross sent Krambeck a number of "discussion points" which he believed were the terms the parties had agreed to and asked Krambeck to confirm the generally agreed upon terms so he could begin to memorialize the agreement. One of the discussion points included a right of first refusal in favor of SMG with regard to managing the Ottumwa casino or any other casino for which Wild Rose obtained a gaming license.

On August 3, Wild Rose Ottumwa (a subsidiary of Wild Rose) and the Ottumwa nonprofit organization executed three agreements—a memorandum of intent, a gaming development agreement, and an operator's contract. Within the "scope of work" portion of the memorandum of intent it states, "Wild Rose shall manage the facility for a fee equal to 2% of revenue plus 10% of operating income, not to exceed 4% of revenue pursuant to a management agreement." In early August, Pavone learned of these agreements and was concerned that Wild Rose had named itself manager of the Ottumwa casino rather than SMG. Pavone discussed his concerns with Kirke and Richards and was told not to worry because the parties would execute an agreement ensuring SMG would manage the Ottumwa casino.

Throughout August, September, and October, Ross and Krambeck regularly conversed and exchanged numerous drafts of a proposed agreement between SMG and Wild Rose. Ross's first draft of the agreement was entitled "Letter of Intent." The draft detailed both Pavone's provision of future consulting services to Wild Rose as well as Pavone's management of the Ottumwa casino, should Wild Rose obtain a gaming license. On September 20, Krambeck suggested the parties execute a straightforward consulting agreement as well as a separate letter of intent or option agreement pertaining to the future ownership and management arrangements, should Wild Rose receive any gaming licenses. Krambeck also provided another draft of the agreement with his corrections simply entitled "Agreement." The parties never executed two separate agreements, and on October 22, 2004, the parties executed a document, entitled "Agreement," that is the subject of this lawsuit. The parties to the agreement were SMG, Wild Rose, Pavone, and Kirke.

The October 22 agreement states the material terms and conditions by which Pavone will provide consulting services to Wild Rose through the opening of a casino in Ottumwa, as well as the ownership and management relationship between the parties upon the opening of the Ottumwa casino and other casino projects within the state of Iowa. The first two paragraphs of the agreement concern the consulting services Pavone is to provide Wild Rose prior to a license award for the Ottumwa casino and through the opening of the Ottumwa casino. Paragraph three of the October agreement states in pertinent part:

> **3. Ownership in Ottumwa Project and Management Entity.** If Wild Rose is awarded a license to operate a casino in Ottumwa, Iowa, then upon completion of the development of the Ottumwa Project, the parties shall grant and convey an interest to each other as follows:

A. *Management Agreement.* Upon completion of the Ottumwa Project, Wild Rose shall enter into an exclusive management agreement with an entity to be solely owned by Pavone (subject to rights of Wild Rose under paragraph C below) for the management of the Ottumwa Project. This Management Agreement shall provide for an annual management fee equal to four percent (4%) of the Adjusted Gross Revenue of the Ottumwa Project. The terms of the Management Agreement shall be similar to the terms of the gaming development agreement between Wild Rose and the City of Ottumwa, Iowa.

Paragraph five of the October agreement provides:

**5. Future Casino Development Opportunities.**

A. First Look and Good Faith Negotiation as to Future Casino Development and Management Opportunities.

i. If Wild Rose has the opportunity to develop or operate any other casino in Iowa, Wild Rose will use good faith best efforts to involve SMG when the opportunity is first known, and to negotiate in good faith a Management Agreement consistent with the terms outlined in Wild Rose's gaming development agreement with the City of Ottumwa, Iowa. It being understood that the award of any management agreement must also be satisfactory to third party community and non-profit organizations. And it being further understood that any casino in the Central Iowa area will likely require the involvement of a management company, other than SMG.

Ross testified the October agreement established a binding consulting and management relationship and established a good-faith relationship between the parties for future projects within Iowa. Conversely, Krambeck testified the October agreement established a binding consulting agreement and a nonbinding letter of intent concerning the parties' relationship in connection with any future gaming opportunities. Whatever the parties' true intent, Wild Rose placed the October 22 agreement within its application to the Iowa

Racing and Gaming Commission (IRGC) for a gaming license in Ottumwa.

On November 2, 2004, the referendum to allow gaming in the counties surrounding Des Moines failed. The next morning, Pavone met with Kirke, Richards, and others to discuss their business strategy going forward. They collectively decided to attempt to obtain a gaming license in Emmetsburg in addition to Ottumwa. Moreover, Kirke and Richards told Pavone that the October agreement, which originally only covered the Ottumwa casino, would also apply to the Emmetsburg casino. Accordingly, Wild Rose placed the October 22 agreement in its application to the IRGC for a gaming license in Emmetsburg. Kirke claims Wild Rose placed the October agreement in the Emmetsburg application merely to demonstrate to the IRGC that it had a consulting agreement with SMG and intended to enter into a management agreement with SMG for the Emmetsburg casino at a later time.

Subsequently, on November 10, Pavone and Wild Rose submitted its Ottumwa and Emmetsburg applications to the IRGC. Both of the applications represented under oath that SMG would be managing the Ottumwa and Emmetsburg casinos by stating:

> The facility operations will be managed by Signature Management Group, L.L.C. (SMG). John Pavone, founder and president of SMG, has been a proactive leader in the Iowa gaming industry since 1989. He was co-founder and former president of the Iowa Riverboat Association and served as Iowa's representative for the American Gaming Association. Pavone will be responsible for ensuring that the resort is built and managed with adherence to the highest standards in the industry for quality and operations.

On December 8, an accountant for the Division of Criminal Investigation (DCI), in connection with doing a background check with the IRGC, sent a letter to DCI Special Agent David Button detailing a

number of questions Wild Rose needed to answer for the accountant to complete his analysis of Wild Rose's Ottumwa and Emmetsburg applications. One of the accountant's questions stated, "Agreement with Pavone and Signature Management Group, LLC (SMG) makes reference to the Ottumwa project not Emmetsburg. I assume this is just an oversight in assembling the two applications. Need to get copy of Emmetsburg Agreement with SMG." Richards received this document and in response to this question, he claims he sent a copy of the October 22, 2004 agreement to Button.

On January 28, 2005, Button sent a follow-up email to Richards stating:

> I'm responsible for the class D background on Signature Mgt for the DCI. I'm in possession of the agreement between Wild Rose and SMG for the Ottumwa project [i.e., the October 22, 2004 Agreement], but do not have the agreement for the Emmetsburg project. Are the agreements identical?
>
> For my report, I will need a copy of the agreement for Emmetsburg. . . .

Richards forwarded this email to Pavone and discussed it with him. As a result of this conversation, Richards and Pavone agreed to provide the DCI with "additional information." Subsequently, Pavone asked Ross to begin conversing with Krambeck about drafting such a document. Moreover, Button never received a response from Wild Rose with regard to his January 28 email.

On February 4, Ross emailed Krambeck:

> John Pavone contacted me today, it appears that he and Mike [Richards] agreed that Signature and Wild Rose will enter into a new letter of intent for Emmetsburg using the same form as the letter of intent on file with DCI as to the Ottumwa property (signed by the parties on 10-2[2]-04).

> I anticipate that there would be date changes and a few other minor changes, but that the existing letter of intent is to [ ] otherwise be fine for Emmetsburg.
>
> . . . .
>
> John has asked me to prepare a draft management agreement for the parties review next week. I will get something put together and get you a copy to look at.

Krambeck never revised the October 22, 2004 agreement to apply to Emmetsburg. Subsequently on February 21, 2005, Ross drafted a more detailed management agreement using an Isle of Capri casino management agreement as a template and forwarded the draft to Krambeck for his review. A few days later, Krambeck responded to the draft with numerous discussion points, indicating Wild Rose was not pleased with a number of items in the agreement.

On February 16, the IRGC held an informational meeting for the gaming license applicants about further information the applicants needed to provide to the IRGC. At this meeting, Wild Rose was asked whether they had a management agreement. Wild Rose responded, "[W]e are negotiating it." Moreover, on March 2, Wild Rose sent a letter to the IRGC stating:

> The management agreement between Signature Management Group and Wild Rose Entertainment is currently under review with our attorneys and will be provided once it has been executed between the parties. As stated in the license applications, this agreement will be consistent with the terms as reflected within the agreement dated October 22, 200[4] and will be applicable to both projects managed for Wild Rose Entertainment in Ottumwa and Emmetsburg by the Signature Management Group.

On March 14, Ross sent Krambeck a second draft of the agreement addressing most of Wild Rose's initial concerns and complaints. On March 18, Ross, Pavone, Richards, and Krambeck held a conference call to discuss the length of the management agreement and the amount of

payment SMG was to receive. Ross felt the parties were close to an agreement at this time. However, as the negotiations continued to progress through March and April, Wild Rose allegedly continued to demand more and more concessions from Pavone. At trial, Pavone described the negotiations deteriorating as follows:

> My goal was to satisfy whatever DCI needed and so that Dr. Richards and I would get this issue moving forward, and then it became kind of a downhill slide on a, quote, renegotiation of everything, and that became a very, very long and very painful process for us of not understanding what was happening.

Sometime between late January and late March, Wild Rose hired Kevin Preston as an operations consultant. Preston had extensive experience in the gaming industry and had experience as a general manager of a casino. Ross and Pavone learned that while they were negotiating the management agreement, Wild Rose was also negotiating a general manager agreement with Preston. Kirke and Richards claim that if they received a gaming license for the Ottumwa casino, they planned to hire Preston as its general manager, who would in turn report to Pavone/SMG as the company charged with the overall management of the facilities. After Pavone learned Wild Rose was planning on hiring Preston as the Ottumwa casino's general manager, he confronted Kirke and Richards about it in a meeting. At some point during the meeting, Kirke allegedly asked Pavone, "[W]hy should I pay you 4 percent if I could get somebody to do it for $160,000 a year and 2 percent?" From this point on, Pavone felt Wild Rose was attempting to get out of the October 22, 2004 agreement and squeeze Pavone/SMG out of the management deal. As the negotiations wore on, Ross also felt Wild Rose

was stalling until after it received a gaming license from the IRGC, after which they could sever their ties with Pavone/SMG.

By late April 2005, Ross and Pavone began to worry that they had made misrepresentations to the IRGC about who was going to manage the Ottumwa and Emmetsburg facilities. Accordingly, Pavone told Ross that he felt he needed to notify the IRGC that the parties did not, as of that date, have a management agreement.

Ross notified Krambeck that Pavone would be contacting the IRGC and informing the IRGC the parties' had not yet renegotiated a management agreement for the Ottumwa and Emmetsburg facilities. Subsequently, on May 3, 2005, Pavone sent a letter to the IRGC stating:

> This correspondence is in response to the request by the IRGC staff for an executed copy of the management agreement between Wild Rose Ottumwa, LLC and the Signature Management Group, L.L.C. for casino operations in Emmetsburg Iowa and Ottumwa Iowa. During our meeting with IRGC Staff on February 16th 2005, we were asked to provide the commission staff with an executed copy of the management agreement consistent with the terms and conditions as outlined between the parties within the letter of intent dated October 22nd 2004. This agreement is contained within our license application as submitted to the IRGC.
>
> After several weeks of negotiations the parties have unfortunately failed to reach an agreement between the parties. Signature Management Group, L.L.C. remains hopeful that the parties may be able to reach an agreement that will be acceptable to both parties however given the state of current negotiations; I would be less than candid if Signature did not express its doubts as to the successful resolution of this matter.
>
> I am proud of my relationship with the IRGC and my many years of service within the Iowa gaming and legislative communities and certainly hope that the current situation with Wild Rose Ottumwa, LLC will not affect my ongoing ability to continue as a valued member of the Iowa gaming and legislative families.

The IRGC viewed this letter as a notification that they would not be receiving a management agreement from Wild Rose to review before they made their gaming license determinations. Kirke believed Pavone sent this letter in an attempt to prevent Wild Rose from receiving gaming licenses for both the Ottumwa and Emmetsburg casinos. In response to this letter, the parties suspended negotiations on a management agreement until after the IRGC awarded the gaming licenses.

On March 11, the IRGC announced which applicants would receive gaming licenses. Wild Rose did not receive a gaming license for Ottumwa, but was awarded a license for the development of the Emmetsburg casino. Subsequently, on May 24, Wild Rose sent a letter to Pavone terminating the October 22, 2004 agreement and any future relationship between the parties. The Emmetsburg casino opened at the end of May 2006. At the time of the casino's opening, Wild Rose Entertainment, L.L.C. was the manager of the facilities and Preston was the acting general manager.

## II. Procedural History.

On March 31, 2006, Pavone and SMG filed a civil action against Kirke and Wild Rose alleging they breached the October 22, 2004 agreement, as well as numerous other claims. The case proceeded to a jury trial, and after SMG completed its case-in-chief, Kirke and Wild Rose filed a motion for a directed verdict. In ruling on the motion, the district court allowed the breach of contract claims pertaining to paragraphs 3A and 5A of the October agreement to be presented to the jury, but sustained Kirke's and Wild Rose's motion on Pavone's and SMG's remaining claims. After Kirke's and Wild Rose's case-in-chief, they renewed their motion for a directed verdict on the remaining claims, which the court overruled.

On September 6, 2007, the jury returned a verdict finding Wild Rose breached both paragraphs 3A and 5A of the October agreement. The jury awarded Pavone and SMG ten million dollars in damages. Kirke and Wild Rose filed a motion for judgment notwithstanding the verdict or for a new trial. On December 31, the district court overruled this motion.

Kirke and Wild Rose filed a notice of appeal. We transferred the case to the court of appeals. The court of appeals reversed the judgment in favor of Pavone and SMG and remanded the case for entry of judgment in favor of Kirke and Wild Rose. The court of appeals found, as a matter of law, paragraph 3A of the October agreement constituted an unenforceable agreement to agree and that the record was devoid of any evidence that Kirke and Wild Rose breached its contractual duty of good faith negotiations under paragraph 5A of the October agreement. Consequently, the court of appeals concluded the district court erred in overruling Kirke's and Wild Rose's motion for a directed verdict on Pavone's and SMG's paragraphs 3A and 5A breach of contract claims. Pavone and SMG filed an application for further review, which we granted.

### III. Issues Raised on Appeal.

Kirke and Wild Rose raise numerous issues on appeal. They are: (1) whether the district court erred in overruling Kirke's and Wild Rose's motion for directed verdict on Pavone's and SMG's paragraph 3A breach of contract claim; (2) whether the statute of frauds precluded testimony the parties orally agreed paragraph 3A of the contract would apply to the Emmetsburg casino; (3) whether the district court erred in overruling Kirke's and Wild Rose's motion for directed verdict on Pavone's and SMG's paragraph 5A breach of contract claim; (4) whether the district

court erred in instructing the jury Pavone and SMG could recover expectation damages on its paragraph 5A breach of contract claim, as opposed to reliance damages; (5) whether Pavone's and SMG's claims are barred because the IRGC never approved a management agreement between the parties; (6) whether the district court erred in allowing the jury to award damages for a period of as much as thirty years because the extension of the contract for such a period was speculative; and (7) whether the district court erred in denying Kirke's and Wild Rose's motion for a new trial because the jury's verdict was inconsistent.

**IV.  Whether the District Court Erred in Overruling Kirke's and Wild Rose's Motion for Directed Verdict on Pavone's and SMG's Paragraph 3A Breach of Contract Claim.**

**A. Scope of Review.**  We review a district court's ruling on a motion for directed verdict for correction of errors at law.  *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5 (Iowa 2009).  "A directed verdict is required 'only if there was no substantial evidence to support the elements of the plaintiff's claim.' "  *Id.* (quoting *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 472 (Iowa 2005)).  Evidence is substantial "[w]hen reasonable minds would accept the evidence as adequate to reach the same findings."  *Easton v. Howard*, 751 N.W.2d 1, 5 (Iowa 2008).  "Where reasonable minds could differ on an issue, directed verdict is improper and the case must go to the jury."  *Stover v. Lakeland Square Owners Ass'n*, 434 N.W.2d 866, 873 (Iowa 1989).  Thus, our role is to determine whether the trial court correctly determined if there was substantial evidence to submit the issue to the jury.  *Easton*, 751 N.W.2d at 5.  In doing so, we must "view the evidence in the light most favorable to the nonmoving party and take into consideration all reasonable inferences that could be fairly made by the jury."  *Id.*

Our review is limited to those grounds raised in the moving party's motion for a directed verdict. *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 844 (Iowa 2010). "Error must be raised with some specificity in a directed verdict motion." *Id.* at 845. Furthermore, "[a] motion for judgment notwithstanding the verdict must stand on grounds raised in the directed verdict motion." *Id.* Thus, on appeal from such judgment, our review is limited to those grounds raised in the directed verdict motion. *Id.*

**B. Analysis.** The district court instructed the jury on the law the jury should use to determine if the parties entered into a binding agreement. The instructions provided:

Instruction No. 10

Concerning their claim for breach of contract, plaintiffs must prove all of the following numbered propositions:

1. The existence of a contract.

2. The terms of the contract.

3. The plaintiffs have done what the contract required.

4. The defendants breached the contract in one or both of the following ways:

> a. In failing to enter into and perform a management agreement of the Emmetsburg casino under paragraph 3(A) of the October 22, 2004 agreement.

> b. In failing to use good faith best efforts to negotiate a management agreement for the Emmetsburg casino under paragraph 5(A) of the October 22, 2004 agreement.

5. The amount of any damage defendants have caused.

If the plaintiffs have failed to prove any of these numbered propositions, the plaintiffs are not entitled to damages. If the plaintiffs have proved all of these numbered propositions, they are entitled to damages in some amount.

Instruction No. 11

The existence of a binding contract requires a meeting of the minds on the material terms. This means the parties must agree upon the same things in the same sense. "Material" terms are those that are significant to the contract. You are to determine if a contract existed from the words and acts of the parties, together with all reasonable inferences you may draw from the surrounding circumstances.

A binding contract may be oral or written or may be inferred from the conduct of the parties. Plaintiffs contend Paragraph 3(A) of the October 22, 2004 agreement was orally modified to include Emmetsburg and that Paragraph 5(A) includes Emmetsburg. Neither real nor apparent intention that a promise be legally binding is essential to the formation of a contract, but an intention that a promise shall not be binding prevents the formation of a contract. An expression of willingness to enter into a contract is not an offer if the party to whom it is addressed knows or has reason to know that the person making it does not intend to be bound until the conclusion of further negotiations. Manifestations of assent that are sufficient to form a contract will not be prevented from being binding by the fact that the parties also state an intention to prepare a written memorial of their agreement; but the circumstances may show that the agreements are preliminary negotiations.

You shall also consider whether the parties intended to be bound prior to the execution of a separate formal written management contract. The factors you may consider as to whether the parties intended to be bound before the execution of a separate, formal written management contract include but are not limited to the following:

1. Whether the contract is of a class usually found to be in writing.

2. Whether it is of a type needing a formal writing for its full expression.

3. Whether it has few or many details.

4. Whether the amount involved is large or small.

5. Whether the contract is common or unusual.

6. Whether all details have been agreed upon or some remain unresolved.

7. Whether the negotiations show a further writing was discussed or contemplated.

## Instruction No. 12

Wild Rose claims that sections 3(A) and 5(A) of the October 22, 2004 agreement are merely non-binding agreements to agree. In determining whether the October agreement is a binding contract or merely a non-binding agreement to agree, you shall consider the following principles:

A binding contract must contain mutual assent. The mode of assent is termed offer and acceptance. An offer is a manifestation of willingness to enter into a bargain. A binding contract requires acceptance of the offer. Acceptance of the offer is indicated by a manifestation of assent to the terms of the offer made by the party to whom it is addressed in a manner invited or required by the offer. Mutual assent is based on objective evidence, not the hidden intent of the parties.

A binding contract generally does not exist when the parties agree to a contract on a basis to be settled in the future. An agreement to agree to enter into a contract is of no effect unless all of the material terms and conditions are agreed on and no material terms and conditions are left to future negotiations.

However, a contract need not contain definitely and specifically every fact in detail to which the parties may agree. The contract need only be certain and unequivocal in its material terms. Absolute certainly is not required. Only reasonable certainty is necessary.

The jury must determine whether the October agreement contained mutual assent with reasonable certainty to all of its material terms or whether it is merely a non-binding agreement to agree on a basis to be settled in future negotiations.

## Instruction No. 13

Parties may have a meeting of the minds as to the material terms of a portion or portions of a contract but not as to others. The fact that a meeting of the minds occurred as to the material terms of some portion or portions of a contract does not mean that there was a meeting of the minds as to all portions of the alleged contract.

You may not award damages based on a section of an alleged contract as to which you do not find that there was a meeting of the minds.

Instruction No. 14

In determining the terms of the contract, you may consider the following:

1. The intent of the parties along with a reasonable application of the surrounding circumstances.

2. The intent expressed in the language used prevails over any secret intention of either party.

3. The intent may be shown by the practical construction of a contract by the parties and by the surrounding circumstances.

4. You must attempt to give meaning to all language of a contract. Because an agreement is to be interpreted as a whole, assume that all of the language is necessary. An interpretation which gives a reasonable, effective meaning to all terms is preferred to an interpretation which leaves a part of the contract unreasonable or meaningless.

5. The meaning of a contract is the interpretation a reasonable person would give it if they were acquainted with the circumstances both before and at the time the contract was made.

6. Ambiguous language in a written contract is interpreted against the party who selected it.

7. Where general and specific terms in the contract refer to the same subject, the specific terms control.

Kirke and Wild Rose failed to raise on appeal any error in the instructions given to the jury on the breach of contract claims. Therefore, right or wrong, the instructions become the law of the case. *Northrup v. Miles Homes, Inc.*, 204 N.W.2d 850, 856 (Iowa 1973).

On our review of the record, we find under the instructions given to the jury, that substantial evidence is contained in the record to support the jury's findings that the October 22, 2004 agreement is a binding management agreement between the parties. A jury could find that the

agreement contains all the material terms and that the parties intended to be bound by those terms. The agreement identified the parties as Pavone, SMG, Wild Rose, and Kirke. The purpose of the agreement was for Pavone and SMG to provide management services to Kirke and Wild Rose for the Emmetsburg casino. The agreement specified that Wild Rose would own the casino. The duration of the agreement, through the incorporation by reference of the Ottumwa Gaming Development Agreement, was for an initial term of ten years, which could be extended for three-year terms at the option of Wild Rose for a term of up to thirty years. The agreement set forth the compensation of the manager would be four percent of adjusted gross revenue together with an equity swap and reciprocal buy-sell agreements. Additionally, the agreement contained a clause allowing termination for cause.

Finally, the jury could have found Kirke's and Wild Rose's manifestation of assent for the agreement in the application filed with the IRGC. The application publicly acknowledged "[t]he facility operations will be managed by Signature Management Group, LLC. . . . Pavone will [be] responsible for ensuring the resort is built and managed with adherence to the highest standards in the industry for quality and operations." Even though Kirke and Wild Rose backed off its manifestation of assent for an Emmetsburg management agreement when pressed, a reasonable person could conclude they had agreed to the Emmetsburg deal when it first communicated its deal to the commission and later reneged by attempting to negotiate new terms.

It is true that Kirke and Wild Rose presented evidence that this agreement was only an agreement to agree. Kirke and Wild Rose relied heavily on a letter Pavone wrote to the IRGC on May 3, 2005, indicating the parties did not have a management agreement as of May 3, 2005. As

did the district court, we do not view this one letter to be dispositive of this issue. We must consider the record as a whole in the light most favorable to the nonmoving party and take into consideration all reasonable inferences that could be fairly made by the jury when determining if substantial evidence supports a verdict. *Easton*, 751 N.W.2d at 5. We agree with the district court, when it overruled Kirke's and Wild Rose's posttrial motion and stated:

> A reasonable finder of fact could conclude that Wild Rose agreed to enter into and perform a management agreement with Pavone on these terms and that no other terms were essential to the transaction. As Pavone puts it, Wild Rose was going to own and Pavone was going to manage. Wild Rose later determined it wanted concessions from plaintiff. For example, Wild Rose wanted the ability to hire and fire key management employees. This is evidenced by the fact Gary Kirke hired Kevin Preston as general manager of the casino without consulting Pavone. However, a reasonable jury could conclude that Pavone's agreement to manage the casino addressed this issue. A jury could reasonably conclude that the authority to manage the casino included the authority to control the hiring and termination of key management employees. A reasonable finder of fact could conclude that when Pavone refused to surrender control of management employees to the owner, the defendants refused to enter into and perform a management agreement on the material terms set forth in the October Agreement thereby breaching paragraph 3(A) of the contract. This was a legitimate jury question. Defendants are not entitled to judgment notwithstanding the verdict.

In other words, the jury could have decided from this record that the parties had a binding contract as of October 22; that Kirke and Wild Rose reneged on its contractual obligations and sought to renegotiate the deal; and that when Pavone realized that Kirke and Wild Rose reneged and would not enter into a formal agreement, Pavone informed the IRGC that, as of May 3, the parties did not have an agreement due to Kirke's and Wild Rose's failure to honor the October 22 agreement. As Pavone's letter stated, the application as filed with the IRGC stated that Pavone

and SMG were going to manage the Emmetsburg casino and the October 22 agreement was the management agreement the parties agreed to follow. In order to avoid any misrepresentations in the original application, Pavone wrote the May 3 letter to inform the IRGC that Kirke and Wild Rose would no longer abide by the October 22 agreement and that the IRGC should be aware of that change of circumstances. In the context of the record as a whole, the jury was not required to construe the May 3 letter to mean the parties never had a management agreement.

For these reasons, we affirm the decision of the district court and vacate the decision of the court of appeals on this issue.

**V. Whether the Statute of Frauds Precluded Testimony the Parties Orally Agreed Paragraph 3A of the Contract Would Apply to the Emmetsburg Casino.**

**A. Scope of Review.** Kirke and Wild Rose argue the statute of frauds precluded Pavone's testimony that the parties orally agreed paragraph 3A of the contract would apply to the Emmetsburg casino. "We review a decision by the district court to admit oral evidence of a contract under an exception to the statute of frauds for correction of errors at law." *Kolkman v. Roth*, 656 N.W.2d 148, 151 (Iowa 2003).

**B. Analysis.** The district court overruled the statute of fraud objections, finding the statute of frauds did not apply because the decision to allow Pavone and SMG to manage the Emmetsburg casino could be performed within one year of its making, or alternatively, the statute of frauds was satisfied because there were written affirmations of the parties' oral agreement.

On appeal, Kirke and Wild Rose argue the October agreement was for a fixed period of more than one year, bringing it within the statute of

frauds. Wild Rose also argues the writings identified by the court were not sufficient to satisfy the statute of frauds.

Iowa's statute of frauds provides:

> Except when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by the party's authorized agent:
>
> . . . .
>
> 4. Those that are not to be performed within one year from the making thereof.

Iowa Code § 622.32 (2003). "The Iowa statute of frauds does not render oral promises invalid. Rather, the statute is a rule of evidence that renders incompetent oral proof of such promises." *Olson v. Nextel Partners, Inc.*, 317 F. Supp. 2d 972, 978 (S.D. Iowa 2004).

> In deciding whether a particular oral contract is governed by the [performance within one year] rule, the question is not whether performance must actually be completed within a year but whether it would be *possible* to perform the contract within that time frame. Put another way, "[c]ontracts of uncertain duration are simply excluded; the provision covers only those contracts whose performance cannot possibly be completed within a year."

*Garland v. Branstad*, 648 N.W.2d 65, 71 (Iowa 2002) (citations omitted) (quoting Restatement (Second) of Contracts § 130 cmt. *a*, at 328 (1981)); *accord Johnson v. Ward*, 265 N.W.2d 746, 747 (Iowa 1978).

First, we must determine whether the statute of frauds applies to this case. Kirke and Wild Rose claim the statute of frauds applies because the October agreement could not possibly be performed within one year. However, they are focused on the wrong agreement. The agreement at issue is the oral agreement to modify the October agreement to apply to the Emmetsburg casino, not the October agreement itself. It is clear that this oral modification agreement was

possible of being performed within one year. Moreover, the fact that the October agreement was included within the Emmetsburg application on November 10, 2004, is strong evidence that this oral agreement was, in fact, performed a few days after its making.

Thus, we conclude the oral modification agreement between the parties falls outside the scope of the statute of frauds because it was capable of being performed within one year.

**VI. Whether the District Court Erred in Overruling Kirke's and Wild Rose's Motion for Directed Verdict on Pavone's and SMG's Paragraph 5A Breach-of-Contract Claim.**

**A. Scope of Review.** The basis for Kirke's and Wild Rose's motion for directed verdict was that there was insufficient evidence to support a finding Kirke and Wild Rose failed to negotiate in good faith under paragraph 5A. Thus, the scope of review is the same as in division IV of this opinion.

**B. Analysis.** The court instructed the jury on this issue as follows:

> Paragraph 5(A) of the October 22, 2004 agreement imposes upon the defendants a duty of good faith in the negotiation of a management agreement for future casino developments including Emmetsburg. A party breaches a duty of good faith by violating community standards of decency, fairness, and reasonableness.
>
> The fact the parties may have failed to reach an agreement as to material terms of a management contract regarding Emmetsburg other than those terms the plaintiffs contend were required by Paragraph 5(A) of the October agreement does not necessarily mean that the defendants acted in bad faith.
>
> You shall consider all of the surrounding facts and circumstances in determining whether the defendants breached a duty of good faith.

Kirke and Wild Rose did not appeal the instruction. Accordingly, it is the law of the case. *Northrup*, 204 N.W.2d at 856.

Viewing the evidence in the light most favorable to Pavone and SMG under the instructions given, and taking into consideration all reasonable inferences that could be made by the jury, we conclude there was substantial evidence by which the jury could conclude Wild Rose refused to negotiate in good faith.

In the October agreement, the parties agreed on the following major terms: (1) Wild Rose would enter into an exclusive management agreement with SMG; (2) SMG's management fee would equal four percent of the adjusted gross revenue of the Emmetsburg project; and (3) the period of the management agreement would last until March 31, 2014, and thereafter SMG would have the right to renew the agreement for succeeding three-year-periods, with the last period terminating on March 31 of the 30th year following commencement of operations. The jury could have found the negotiations for the Emmetsburg management agreement wore on for months and every time Pavone and SMG believed they were close to an agreement, Kirke and Wild Rose would raise new objections or demand more concessions.

The jury could also conclude from the evidence that Kirke and Wild Rose were stalling the negotiations while attempting to negotiate a more beneficial management agreement with Preston. This is supported by Pavone's testimony that Kirke asked him, "[W]hy should I pay you 4 percent if I could get somebody to do it for $160,000 a year and 2 percent?"

Moreover, the jury could have also found that as the attorneys for the parties exchanged numerous drafts of the management agreement, Kirke and Wild Rose forced Pavone and SMG to concede terms that the

parties had already agreed to in the October agreement. For example, in the fourth draft and subsequent drafts of the proposed Emmetsburg management agreement, the term was for ten years with no right to renew the agreement and the management fee was 3.24 percent of adjusted gross revenue. Finally, the jury could have inferred a lack of good faith on Kirke's and Wild Rose's part due to Kirke's and Wild Rose's termination of their relationship with Pavone and SMG shortly after they received a gaming license. This fact could have supported a finding that Kirke and Wild Rose never intended to enter into a formal management agreement with Pavone and SMG and were simply using Pavone and SMG to procure a gaming license for the Emmetsburg casino.

For these reasons, we affirm the decision of the district court and vacate the decision of the court of appeals on this issue.

**VII. Whether the District Court Erred in Instructing the Jury Pavone and SMG Could Recover Expectation Damages on Its Paragraph 5A Breach-of-Contract Claim, as Opposed to Reliance Damages.**

Kirke and Wild Rose next argues the district court erred in instructing the jury Pavone and SMG could recover expectation damages on its paragraph 5A breach-of-contract claim, as opposed to reliance damages. The court submitted this case with special interrogatories. The first interrogatory asked the jury to determine if Kirke and Wild Rose breached paragraph 3A of the October 22 agreement. The jury answered yes to this interrogatory. The second interrogatory asked the jury to determine if Kirke and Wild Rose breached paragraph 5A of the October 22 agreement. The jury also answered yes to this interrogatory.

Kirke and Wild Rose did not appeal the right of Pavone and SMG to recover expectation damages for a breach of paragraph 3A. Therefore, the award of expectation damages is proper for a breach of paragraph 3A.

Thus, it makes no difference under this record that the jury may have awarded expectation damages for a breach of paragraph 5A because Pavone and SMG were entitled to expectation damages for a breach of paragraph 3A.

Accordingly, we need not reach this issue because any error in the instructions would be harmless.

**VIII. Whether Pavone's and SMG's Claims Are Barred Because the IRGC Never Approved a Management Agreement Between the Parties.**

In its motion for judgment notwithstanding the verdict, Kirke and Wild Rose stated the evidence was insufficient to submit paragraphs 3A and 5A claims because Iowa law requires IRGC approval of any management agreement, and no such approval was ever received. "We review the denial of a motion for judgment notwithstanding the verdict for correction of errors at law." *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010). However, it appears we need not reach the merits of this issue because Kirke and Wild Rose have failed to preserve this issue for review.

"A motion for judgment notwithstanding the verdict must stand on grounds raised in the directed verdict motion." *Royal Indem. Co.*, 786 N.W.2d at 845; *accord Van Sickle Constr. Co.*, 783 N.W.2d at 687 ("[T]he motion for judgment notwithstanding the verdict must rely on the matters raised in a previous motion for directed verdict."); *Dutcher v. Lewis*, 221 N.W.2d 755, 760 (Iowa 1974) ("A motion for judgment notwithstanding the verdict cannot be sustained on any ground not asserted in an earlier motion for directed verdict."). "On appeal from such judgment, review by an appellate court is limited to those grounds

raised in the directed verdict motion." *Royal Indem. Co.*, 786 N.W.2d at 845.

At the close of Pavone's and SMG's case-in-chief, Wild Rose filed a motion for directed verdict. This motion did not raise the issue of the IRGC's approval. Subsequently, at the close of Kirke's and Wild Rose's case-in-chief, they renewed their motion for directed verdict on the same grounds as previously identified. The court overruled the motion.

After the jury returned a verdict in favor of Pavone and SMG, Kirke and Wild Rose filed a motion for judgment notwithstanding the verdict, for the first time raising its IRGC-approval argument. Therefore, because Kirke's and Wild Rose's IRGC-approval argument is not based on grounds raised in its directed verdict motion, Kirke and Wild Rose failed to preserve this issue for appellate review.

Kirke and Wild Rose argue it preserved error on this issue based on its general statement that "no reasonable jury could find that the October agreement was a binding management agreement" in its motion for a directed verdict. Kirke and Wild Rose also claim that the principles underlying the error preservation rules have been satisfied here because the IRGC-approval issue was brought to the attention of the district court and ruled on in the motion for judgment notwithstanding the verdict. However, the statement in Kirke's and Wild Rose's motion for directed verdict is too general to preserve the IRGC-approval issue. *See, e.g., Royal Indem. Co.*, 786 N.W.2d at 845 ("Error must be raised with some specificity in a directed verdict motion.").

Consequently, we refuse to consider the merits of this issue due to Kirke's and Wild Rose's failure to preserve it for appellate review.

**IX. Whether the District Court Erred in Allowing the Jury to Award Damages for a Period of as Much as Thirty Years Because the Extension of the Contract for Such a Period Was Speculative.**

**A. Scope of Review.** Kirke and Wild Rose argue the district court erred in allowing the jury to award damages for a period of as much as thirty years because the extension of the contract for such a period was speculative. We review a claim that the district court gave an instruction not supported by the evidence for correction of errors at law. *Summy v. City of Des Moines*, 708 N.W.2d 333, 340 (Iowa 2006). "We review the related claim that the trial court should have given a party's requested instructions for abuse of discretion." *Id.* It is reversible error to submit an instruction that has no support in the record. *Waits v. United Fire & Cas. Co.*, 572 N.W.2d 565, 575 (Iowa 1997). " 'When considering whether evidentiary support for an instruction exists, we give the evidence the most favorable construction it will bear.' " *Id.* (quoting *Hughes v. Massey-Ferguson, Inc.*, 522 N.W.2d 294, 295 (Iowa 1994)).

**B. Analysis.** The jury awarded Pavone and SMG ten million dollars in expectation damages resulting from Kirke's and Wild Rose's breaches of paragraphs 3A and 5A of the October agreement. Kirke and Wild Rose argue the district court erred in failing to instruct the jury that Pavone and SMG could recover damages only for the initial term of the contract and thereby allowed the jury to award speculative damages beyond the initial term of the alleged agreement. In response, Pavone and SMG claim sufficient evidence supports the agreement was for a thirty-year term, and alternatively, there is no basis to conclude the jury awarded thirty years worth of expectancy damages.

"There is a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages." *Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 309 (Iowa 1998). If the evidence is

speculative and uncertain whether damages have been sustained, damages are denied. *Id.* However, if the uncertainty merely lies in the amount of damages sustained, " 'recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated.' " *Id.* (quoting *Orkin Exterminating Co. v. Burnett*, 160 N.W.2d 427, 430 (Iowa 1968)). Thus, some speculation on the amount of damages sustained is acceptable; however, overly speculative damages cannot be recovered. *Id.*

There is a reasonable basis in the record from which the amount of damages awarded by the jury can be inferred or approximated. At trial, there was testimony that, for the first five years of the Emmetsburg casino management agreement between the parties, it was conservatively projected Pavone and SMG would earn $6,597,029 in management fees. This management fee projection was included in the Emmetsburg application to the IRGC. Assuming the casino's revenue remained flat for the next three years, the projected management fees for eight years—the shortest period Kirke and Wild Rose argued for—would total $10,889,108, which is $889,108 more than what the jury awarded Pavone and SMG. Moreover, Pavone testified that at 3.2 percent, Pavone and SMG would have earned approximately $9.7 million in management fees over the initial ten-year term of the management agreement.

> We agree with the district court when it held,
>
> The parties may have their theories as to how the jury arrived at a damage figure of $10 Million, but the bottom line is that the damages awarded by the jury fall within a reasonable verdict range based on this record and it is impossible to know what duration the jury found. This finding inheres in the verdict.

Accordingly, we find the court did not error in the manner in which it submitted the damage issue.

**X. Whether the District Court Erred in Denying Kirke's and Wild Rose's Motion for a New Trial Because the Jury's Verdict Was Inconsistent.**

**A. Preservation of Error.** We have serious doubts as to whether Kirke and Wild Rose preserved error on this issue. In its motion for a new trial, Kirke and Wild Rose argued there was an inconsistency between the verdicts on Pavone's and SMG's paragraphs 3A and 5A claims, which requires a new trial. Pavone and SMG argue Kirke and Wild Rose failed to preserve this claim for review. They base this argument on the fact that Kirke and Wild Rose failed to object to the jury instructions and/or to the verdict forms that were given, as well as failed to propose any alternative jury instructions and/or verdict forms that would have required the jury to find liability on either the paragraph 3A or paragraph 5A claim, but not both.

Instruction 10 told the jury that it could find Kirke and Wild Rose breached the contract by finding a breach of paragraph 3A *and* paragraph 5A. The special interrogatories also did not preclude a finding by the jury of a violation of both paragraphs. Kirke and Wild Rose failed to object to the submission of the instructions in this manner. The court clearly instructed the jury that it could find for Pavone and SMG on both claims. The manner in which the court instructed the jury caused the alleged inconsistent verdict and Kirke and Wild Rose should have foreseen the problem. A review of the proposed instructions would have indicated that the alleged inconsistent verdict was not only possible, but probable.

Our rules of civil procedure require

all objections to giving or failing to give any instruction must be made in writing or dictated into the record, out of the jury's presence, specifying the matter objected to and on what grounds. *No other grounds or objections shall be asserted thereafter, or considered on appeal.*

Iowa R. Civ. P. 1.924 (emphasis added). The purpose of the rule is to enable trial counsel to correct any errors in the instructions before the court submits the case to the jury. *Briney v. Tri-State Mut. Grain Dealers Fire Ins. Co.*, 254 Iowa 673, 688, 117 N.W.2d 889, 897 (1962). It would be unfair to approve a trial tactic to allow counsel to implant a ground for a new trial should the jury verdict later prove objectionable.

In light of our doubt, we will still reach the merits of this issue. In the future, counsel should make the appropriate objection when it is clear the instructions invite inconsistent verdicts.

**B. Scope of Review.** In its motion for a new trial, Kirke and Wild Rose argued there was an inconsistency between the verdicts on Pavone's and SMG's paragraphs 3A and 5A claims, which requires a new trial. The district court overruled this motion, finding there was no inconsistency between the verdicts. "The scope of our review of a district court's ruling on a motion for new trial depends on the grounds raised in the motion." *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 859 (Iowa 2001). " 'To the extent the motion is based on a discretionary ground, we review it for an abuse of discretion. But if the motion is based on a legal question, our review is on error.' " *Id.* (quoting *Roling v. Daily*, 596 N.W.2d 72, 76 (Iowa 1999)). Here, one of the underlying grounds for Kirke's and Wild Rose's motion for a new trial was based on a claim of inconsistent answers in the verdict.

> Generally, the trial court has some discretion when faced with inconsistent answers in a verdict. However, the question whether a verdict is inconsistent so as to give rise to the exercise of that discretion is a question of law. Therefore, we review the district court's conclusion as to

whether answers are inconsistent for correction of errors at law.

*Clinton Physical Therapy Servs., P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 609 (Iowa 2006) (citations omitted). Therefore, we will review this issue for corrections of error at law.

**C. Analysis.** Jury verdicts can be in the form of a general verdict, special verdict, or general verdict with special interrogatories. *Id.* at 610. "A special verdict consists entirely of questions that elicit special written answers to resolve the material issues of fact in the case, and the court then enters judgment based on the findings made by the jury." *Id.*; *accord* Iowa R. Civ. P. 1.933; *Pexa v. Auto Owners Ins. Co.*, 686 N.W.2d 150, 160 (Iowa 2004). The jury's answers become special written findings of fact. *Clinton Physical Therapy Servs.*, 714 N.W.2d at 610. The jury does not enter a general verdict and does not consider the effect of its special findings. *Id.* "Instead, the court enters judgment by applying the law to the findings." *Id.*

Here, the district court submitted a special verdict form to the jury, which asked the following questions:

1. Do you find the defendants breached Paragraph 3(A) of the October 22, 2004 agreement?

      Answer:    Yes \_\_\_\_

                No \_\_\_\_

2. Do you find the defendants breached paragraph 5(A) of the October 22, 2004 agreement?

      Answer:    Yes \_\_\_\_

                No \_\_\_\_

[If your answers to both Special Interrogatories 1 and 2 are "no" do not answer any more questions. If your answers to either *or both* of Special Interrogatories 1 and 2 is "yes" answer Special Interrogatories Nos. 3 and 4.]

3. State the amount of damages caused by the breach?

> Answer: _____

4. Do you find defendant Gerald M. Kirke individually liable for any breach of contract by defendant Wild Rose Entertainment, L.L.C., under a personal guarantee?

> Answer:    Yes ____
>
> No ____

In response to questions one and two, the jury found Kirke and Wild Rose breached both paragraphs 3A and 5A of the October agreement. In response to question three, the jury awarded Pavone and SMG ten million dollars in damages. In response to question four, the jury answered yes. Accordingly, the district court entered judgment for ten million dollars in favor of Pavone and SMG against Kirke and Wild Rose.

After the return of the verdict, Kirke and Wild Rose filed a motion for a new trial, claiming the jury's answers to questions one and two were inconsistent. The district court overruled this motion, finding the jury's answers could be read in a consistent manner.

Kirke and Wild Rose argue the conflicting theories of breach under paragraphs 3A and 5A of the October agreement are inconsistent with one another, meaning if the jury found a breach under paragraph 3A it could not have logically found a breach under paragraph 5A. Kirke and Wild Rose make this argument claiming that for the jury to find a breach under paragraph 3A it necessarily had to find paragraph 3A constituted a binding management contract for the Emmetsburg casino. Therefore, for the jury to find a breach under paragraph 5A it necessarily had to find Kirke's and Wild Rose's bad faith negotiations prevented the parties from entering into a management agreement for the Emmetsburg casino.

Thus, Kirke and Wild Rose argue the jury's special written findings of fact are fatally inconsistent, necessitating a new trial.

In the case of special verdicts, the district court enters judgment based on the jury's special written findings of fact. *Clinton Physical Therapy Servs.*, 714 N.W.2d at 611. The evidence presented at trial must support each of the jury's findings of fact. *Id.* Furthermore, the jury's findings of fact cannot be internally inconsistent. *Id.*; *accord Bangs v. Pioneer Janitorial of Ames, Inc.*, 570 N.W.2d 630, 632 (Iowa 1997) ("If a verdict is internally inconsistent . . . and there is no way to determine the jury's intent, the proper remedy is a new trial."); 89 C.J.S. *Trial* § 992, at 603 (2001) (stating, when findings in special verdicts "are utterly and irreconcilably inconsistent with, or repugnant to, each other, they neutralize, nullify, or destroy each other"). If the jury's special findings of fact are internally inconsistent with each other, the district court may either send the jury back for additional deliberations or grant a new trial. Iowa R. Civ. P. 1.934 (providing if answers to interrogatories are inconsistent court can either send the jury back or order new trial); *Clinton Physical Therapy Servs.*, 714 N.W.2d at 612–13 (recognizing the rules governing internally inconsistent special interrogatory answers apply equally to internally inconsistent answers in a special verdict). However, "[i]f the answers are not inconsistent, the court . . . is permitted to enter judgment consistent with the jury's answers." *Clinton Physical Therapy Servs.*, 714 N.W.2d at 613. Accordingly, on review, we must first determine whether an internal inconsistency in the jury's answers to the special verdict exists.

"[A] verdict is not inconsistent if it can be harmonized in a reasonable manner consistent with the jury instructions and the evidence in the case, including fair inferences drawn from the evidence."

*Id.*; *accord Hoffman v. Nat'l Med. Enters., Inc.*, 442 N.W.2d 123, 126–27 (Iowa 1989). This test recognizes the court must consider how the jury could have viewed the evidence and how that view of the evidence fits into the requirements of the instructions, when determining whether two answers are internally inconsistent. *Clinton Physical Therapy Servs.*, 714 N.W.2d at 613 (citing 66 C.J.S. *New Trial* § 82, at 172 (1998)). In the end, "two answers are not inconsistent if they can be harmonized under the evidence and the instructions." *Clinton Physical Therapy Servs.*, 714 N.W.2d at 613. "When, under this analysis, two answers or findings by the jury would compel the rendition of different judgments, the answers are inconsistent." *Id.*; *accord Hoffman*, 442 N.W.2d at 127 ("Only where the verdicts are so logically and legally inconsistent that they cannot be reconciled will they be set aside."). When deciding if a verdict is inconsistent, we liberally construe the jury's verdict to give effect to the jury's intention and harmonize the jury's answers if possible. *Hoffman*, 442 N.W.2d at 126. We also must determine whether the verdicts can be reconciled in a manner reasonably consistent with the evidence and the jury instructions. *Id.* at 126–27.

We find the jury's special interrogatory answers can be harmonized in a reasonable manner consistent with the jury instructions and the evidence in the case, including fair inferences drawn from the evidence. The instructions given by the court allowed the jury to find a breach of paragraphs 3A and 5A. The instructions did not make such a finding mutually exclusive.

The jury could have concluded the October 22 agreement was a binding management agreement. The jury could have also concluded that another document had to be executed by the parties to include the nonmaterial terms normally found in an integrated agreement. The jury

could have further found that the parties needed to submit the later document to the IRGC. Finally, the jury could have concluded that Kirke and Wild Rose breached paragraph 5A of the agreement by not negotiating a formal final agreement in good faith with Pavone and SMG. As we previously held, the record contained substantial evidence that the October 22 agreement was a binding management agreement and that Kirke and Wild Rose did not conduct any negotiations after October 22 in good faith.

Accordingly, the district court was correct for denying Kirke's and Wild Rose's motion for a new trial on this ground.

### XI. Disposition.

The district court did not commit any error in the trial of this matter; therefore, we vacate the decision of the court of appeals and affirm the judgment of the district court.

**COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Appel, Waterman, and Mansfield, JJ., who take no part.