## IN THE COURT OF APPEALS OF IOWA

No. 15-2053
Filed March 22, 2017

MARY BATINICH as PERSONAL REPRESENTATIVE of the ESTATE of ALEX
BATINICH,
    Plaintiff-Appellee,

**vs.**

**ARTHUR RENANDER,**
    Defendant-Appellant,

vs.

JACQUELINE ZARA RENANDER and RAI, LLC,
    Defendants.
_____

Appeal from the Iowa District Court for Johnson County, Mary E.
Chicchelly, Judge.

Arthur Renander appeals the remedies and damages awarded to Alex
Batinich by the district court, including trial attorney fees, punitive damages, and
dissociation from the parties' limited liability company, following the court's entry
of a default judgment. **AFFIRMED-IN-PART, VACATED-IN-PART, AND
REMANDED WITH DIRECTIONS.**

Christopher J. Foster of Foster Law Office, Iowa City, for appellant.

David M. Caves and Paul D. Burns of Bradley & Riley PC, Iowa City, for
appellee.

Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**DOYLE, Judge.**

Following entry of a default judgment against Arthur and Zara Renander and a subsequent hearing on remedies and damages, the district court awarded Alex Batinich[1] monetary damages, punitive damages, and trial attorney fees individually against the Renanders. The court also dissociated the Renanders from the parties' limited liability company. Arthur appeals the court's ruling on remedies and damages in various respects. Upon our review, we affirm in part, vacate in part, and remand with directions.

### *I. Background Facts.*

RAI, LLC (RAI) is an Iowa limited liability company (LLC) that was organized in 2001 by Arthur and Zara Renander. At some point, Alex Batinich purchased a thirty-four-percent share of the company, and the Renanders retained the majority share as managing members. RAI's sole asset was a fifty-percent ownership interest in about one-hundred acres of land in Coralville, Iowa. Northern Investments, L.C., owned by Gary Aamodt, held the other half of the real-estate interest in the land.[2]

The relevant parties have been involved in protracted litigation concerning the real estate for many years, and the saga continues. *See, e.g.*, *Renander v. High Country Dev. Co.*, No. 16-0424, 2016 WL 7393906, at *1 (Iowa Ct. App. Dec. 21, 2016); *Renander v. Aamodt*, No. 08-1321, 2009 WL 3775112 (Iowa Ct. App. Nov. 12, 2009); *Batinich v. Renander*, No. 05-1969, 2007 WL 913872 (Iowa

---

[1] Alex Batinich died on June 15, 2016, after this appeal was filed. Batinich's wife, Mary, as personal representative of the Estate of Alex Batinich, was substituted as plaintiff-appellee in this matter. *See* Iowa R. Civ. P. 1.221; Iowa R. App. P. 6.109(3).
[2] Because Northern Investments, L.C. is owned by Aamodt, we will refer to both as "Aamodt."

Ct. App. Mar. 28, 2007). In the instant case, Batinich filed suit—individually and derivatively on behalf of RAI—against the Renanders and RAI in June 2014. The petition—and Batinich's affidavit attached thereto—stated the derivative claims were brought pursuant to Iowa Code section 489.902(2) (2013) because the ordinary notice and demand required under section 489.902(1) would have been futile. The petition then set forth four counts.

Count I of the petition asserted the Renanders breached their fiduciary duties to Batinich and RAI and proximately caused damages to both Batinich and RAI. Batinich, individually and derivatively on behalf of RAI, requested that "judgment be entered against the Renanders to fully and fairly compensate [Batinich and RAI] for the damages caused by the Renanders, for costs, for attorney's fees, and for other such relief as the [court deemed] equitable." Count II requested the Renanders be ordered to make a complete accounting to Batinich of RAI's assets, liabilities, and other obligations, and also requested the same relief as Count I. Count III alleged the Renanders, as the majority owners and managers of RAI, were in violation of Iowa Code section 489.410 for failing to make company information requested by Batinich available for his inspection. Batinich, individually and on behalf of RAI, requested the Renanders

**be ordered to comply with [section] 489.410, make available to Batinich the information and records required under section 489.410, make available information regarding RAI's activities, financial information, and other circumstances which [the Renanders] know and is material to Batinich, and request judgment against the Renanders to fully and fairly compensate them for the damages caused by the Renanders, for costs, for attorney's fees, and for other such relief as the [court deemed] equitable.**

Finally, Count IV requested the Renanders be ordered to escrow

**any and all proceeds from the sale of the Real Estate [the Coralville property], or any other assets received for RAI, until such time as this litigation is concluded and the members resolve disputes over the amounts and calculations of the debts of the company and entitlement and amounts of distributions, and for costs, for attorney's fees, and for other such relief as the [court deemed] equitable.**

In April 2015, the district court found the Renanders in contempt for "knowingly, willfully, and without justification, disregard[ing] their discovery obligations and disobey[ing the] court's discovery orders." Citing Iowa Rule of Civil Procedure 1.517(2)(b)(3), the court concluded a default judgment should be entered against the Renanders on all counts of Batinich's petition following "a hearing . . . to consider and determine the appropriate damages and remedies" to be awarded to Batinich. The court ordered the Renanders to produce any documents previously ordered but not yet given to Batinich. The court also ordered the Renanders to pay Batinich $7355 in attorney fees, which the court found was reasonable and incurred as a result of the Renanders' discovery abuses.

The hearing on damages and remedies commenced in July 2015. At that time, Batinich's health was declining, and the parties' agreed his testimony would be given via deposition, to be held after the hearing. The parties agreed the record would be held open after the hearing for submission of the deposition.

The court heard testimony at the hearing from Batinich's wife, Mary, and also from Gary Aamodt, and Arthur Renander. Prior thereto, Batinich's attorney gave an opening statement, explaining the course of the litigation and the numerous ways Batinich believed the Renanders breached their fiduciary duties as the member-managers of RAI. Batinich's counsel stated:

> **Batinich has over the years advanced his personal funds to pay bills on behalf of RAI, everything from landscaping bills and snow shoveling to paying property taxes to paying attorney's fees that RAI incurred. We've asked for an accounting. We've asked repeatedly to see the books of RAI reflecting those contributions, those loans to the company. There's nothing resembling a proper accounting, nothing resembling a financial statement, a proper accounting of the loans that have been advanced over the years. We've asked for corporate records under the Iowa corporate records statute. That's one of the claims in this case. Basically, we're told they don't exist. Most of them just don't exist, all of which is another breach of his duty of standard of care of managing the company . . . .**

Counsel advised that in detailing the parties' history and their dealings to the court, "it wasn't in order to establish liability. And when you see the documents and the exhibits, it's not to establish liability. It's to show the persistent nature of these abuses, to give you a sense of a problem when you're fashioning a remedy." Batinich's counsel suggested the following damages to the court: (1) dissociation of the Renanders from RAI to allow Batinich to get an honest accounting of RAI's financials and to allow RAI's percentage of the real estate to be sold; (2) monetary damages, which counsel suggested could be calculated by subtracting the lesser profit Batinich could expect to receive as a member of RAI from the pending $4.5 million sale from the larger profit Batinich would have received had the property been sold in 2010 for $4.7 million but for the Renanders interference; counsel advised the difference between the two profit figures did not even account for the loans Batinich made to RAI; and (3) punitive damages for breach of fiduciary duty.

Batinich's wife testified Batinich initially invested $125,000 in RAI, and then invested another $250,000. She testified that, since that time, Batinich had

invested at least another $380,000 and, if legal fees were factored in, Batinich had spent about $1.2 million concerning RAI. Mrs. Batinich testified Batinich initially believed the Renanders were keeping accounting records for RAI but, after Batinich requested the records and received none, Batinich started keeping his own records. The Renanders objected to the relevance of this testimony and an exhibit listing monies Batinich had paid for RAI, noting that some of the listed expenditures went all the way back to 2003, "a time period not contemplated at all by the petition or really any of the things that are at issue." Batinich's counsel explained both were relevant, though Batinich was not

**representing that all of these monies [listed on the exhibit were] owed from RAI to [Batinich]. It's just an illustration of money that has been advanced, some of which is relevant in here. We need an accounting so we can sort out which of these are proper debts owed from RAI to Mr. Batinich and which ones aren't. That's the job of the manager of the LLC to do that, to have it done. We've asked for an accounting.**

The court allowed the testimony and exhibit.

Aamodt testified he had "[n]o doubt whatsoever" that the real estate could have sold in 2010 for $4.7 million. He testified the parties received an actual offer for that amount, but he believed they could get more than $5 million for the property and wanted to submit a counter offer. He admitted that if a counter offer had been submitted the buyers could have walked away altogether, but he explained that he knew the persons offering to purchase the land were very interested in the property and, based upon conversations he had had with one of the potential buyers, he believed they could get about $5.2 million. He testified he had urged Arthur to agree to his proposed counter offer, but Arthur refused unless the offer included a transfer of part of the land to the Renanders.

Arthur testified he thought the potential buyers in 2010 "were highly motivated" and "would have gotten the money together." But Arthur admitted he did want land, and he testified his request of land as part of the deal bothered Batinich and Aamodt "enormously . . . because they could see that the way to make money was to sell this land in parcels retail rather than dump it wholesale with the whole parcel, and [he] was going to pursue a much more attractive option." He explained:

> [Y]ou see, what happens is this. If we get cash and buy separately, not in the same transaction, maybe that afternoon, so many acres back, that's our business. So it isn't—they're two transactions. The reason that Mr. Aamodt is so upset is, he knows that I know what to do with this land and how attractive it is. Now, think about this. It doesn't affect one dime of cash that goes to Aamodt or Batinich if I use it to buy back land. That's a total figment of everybody's imagination, meaning [Batinich, Batinich's wife, and Aamodt], that somehow I'm hurting them when not in any way is the amount of cash that goes to them is affected, because I just use my cash to buy back land. Nothing wrong with that, okay.

As to RAI's accounting, Arthur testified RAI had no bank account because the LLC did not need or want one. He believed a bank account would be a detriment, testifying

> we have very, very few expenses. Snow removal, $1300 in taxes a year, and some grass mowing, and that's it. And if you want to take individual deductions, the easiest thing to do is for each of us that are paying these taxes in this room could write a check and take it off their tax, so you don't need it. You don't need an account.

Arthur went on to testify he and his wife paid sixty-six percent of RAI's expenses from their own personal accounts and Batinich only paid thirty-four percent of the expenses. No exhibits or other evidence was provided by Arthur to substantiate his claim.

At the conclusion of the hearing, the court advised it would allow the record to remain open for submission of Batinich's deposition testimony. Later, a telephonic hearing was set for the continuation of the damages hearing and the court noted it was anticipated Batinich's testimony would be submitted by that time. Following the telephonic hearing, which was not reported, the court directed Batinich to file his transcript and the matter would be deemed submitted. The court directed the parties to submit briefs. The transcript was submitted, and both parties' briefs were timely filed.

Batinich's brief essentially restated his request that the court grant him the relief set out in his counsel's argument at the remedies and damages hearing. Batinich also requested attorney fees based upon section 489.906(2) "and because the Renanders committed an intentional tort."

The Renanders' brief argued Batinich failed to establish he was entitled to damages individually or that the Renanders caused him certain damages. They asserted that "the discussion of the desire for land was essentially an attempt to negotiate a side deal wherein RAI would receive cash and [Arthur] would essentially be able to use that cash to immediately buy back land," which they maintained was permitted under RAI's operating agreement that permitted them "to engage in business that directly competed with the business of RAI." They also contended dissociating the Renanders from RAI was an absurd and unnecessary remedy, stating, among other things, that "[i]t should be abundantly clear that [the] Renanders wish for a sale of the land that ultimately benefits RAI as a whole. . . . It is just as much in the Renanders' interest as it is in Batinich's

interest to have the property sold at a profit." The Renanders' brief did not address Batinich's request for punitive damages.

Thereafter, the district court entered its ruling in favor of Batinich. The court did not find Arthur to be credible, stating it "found his testimony to largely be a self-serving attempt to either excuse his own conduct or to attempt to cloud the issues before the court, or both," and it did "not consider his testimony probative on any issue before it at this time." Conversely, the court explicitly found Mary Batinich's testimony credible and determined Batinich paid the Renanders

> **hundreds of thousands of dollars . . . for RAI expenses and taxes, but RAI has provided no records to show what has been done with the money. Batinich requested RAI hold annual meetings and provide an accounting. The court cannot find that an accounting has been provided at any point in time by the Renanders for RAI; no books of the corporation have been produced, no bank records have been shown to exist, and no corporate formalities appear to have been in place at any point in time for RAI. In this regard, the Renanders as managers of RAI have utterly failed, and have breached their duties to the minority shareholder [Batinich] herein as such.**

The court found the Renanders

> **have engaged in and were engaging in conduct that adversely and materially affected RAI's activities, insofar as they materially breached the operating agreement and their duties and obligations under Iowa Code section 489.409 by breaching their duty of loyalty and care, loyalty to account to the company and hold as a trustee any property of the company, including a company opportunity and a duty to refrain from competing with the company in the conduct of the company's affairs and to act in the best interests of the company.**

The court also found the Renanders

> **engaged in conduct violative of these duties primarily insofar as they demanded personally for themselves land in any transaction to sell the property at issue in this matter, thereby holding up sale of the property on October 31, 2010, . . . a sale which, but for the Renanders' self-dealing, would have taken**

**place at a time which would have allowed RAI to pay off its
debts at a far lower dollar figure.**

As remedies, the court dissociated the Renanders from RAI pursuant to Iowa Code section 489.602 and changed their status from member-managers to transferees. Additionally, the court determined Batinich was individually entitled to recover damages from the Renanders, jointly and severally, including a money judgment of $373,880, attorney fees in the amount of $79,956.01, and punitive damages of $100,000 "in light of the [Renanders'] breach of fiduciary duties."

Arthur Renander appeals the district court's ruling on remedies on damages, asserting the district court erred in five respects: (1) dissociating the Renanders from RAI without authority under the facts of the case, (2) awarding Batinich a monetary judgment individually, (3) entering judgment against the Renanders, individually, (4) awarding Batinich trial attorney fees, and (5) awarding Batinich punitive damages. We address his arguments in turn, reviewing the majority of his claims de novo. *See* Iowa R. App. P. 6.907; *Cookies Food Prods., Inc., by Rowedder v. Lakes Warehouse Distrib., Inc.*, 430 N.W.2d 447, 448 (Iowa 1988) ("We review decisions in shareholders' derivative suits de novo, deferring especially to district court findings where the credibility of witnesses is a factor in the outcome."). However, challenges to a district court's grant of attorney fees are reviewed for an abuse of discretion. *See Smith v. Iowa State Univ. of Sci. & Tech.*, 885 N.W.2d 620, 624 (Iowa 2016).

*II. Discussion.*

*A. Dissociation.*

Renander first contends that the district court "was entirely outside of its authority to expel the two members that make up a majority of the ownership without [Batinich] having follow[ed] required and proper procedure and suing derivatively to enforce that right." At first blush, his argument seems to have some merit. Iowa Code section 489.602 allows dissociation of a member by judicial order upon application for such by the LLC. *See* Iowa Code § 489.602(5). A member may maintain a derivative action to enforce a right of the LLC pursuant to Iowa Code section 489.902(1) if the member

**makes a demand on the other members . . . requesting that**
**they cause the company to bring an action to enforce the right,**
**and the managers or other members do not bring the action**
**within ninety days from the date the demand was made unless**
**the member has earlier been notified that the demand has**
**been rejected by the company or unless irreparable injury to**
**the company would result by waiting for the expiration of the**
**ninety-day period.**

Renander puts the two provisions together to maintain that, "[i]n order to sue derivatively on that issue, and request the expulsion, the demand, or the statement of futility, must include a demand that the company make application to judicially expel a member." However, Renander ignores subsection (2) of section 489.902, which excuses the member from making such demands of the LLC if they "would be futile." *Id.* § 489.902(2); *see also* 6 Matthew G. Dore, *Iowa Practice Series: Business Organization*s § 39:4 (2012 ed.).

While section 489.904(2) requires the complaint in a derivative action under section 489.902 state with particularity "the reasons a demand under

section [489.902(1)] would be futile," it does *not* expressly require stating all of the demands that have been made. To do so would eliminate any need for section 489.902(2). Clearly, the member must only explain why making the demand would be futile. *See Berger v. Gen. United Grp., Inc.*, 268 N.W.2d 630, 636 (Iowa 1978) ("[W]e are persuaded by those decisions which hold a general allegation of futility of demand is sufficient if other assertions of fact in the petition are detailed enough to demonstrate a demand would have been unavailing.").

Here, Batinich's petition and his affidavit filed therewith satisfy the criteria of section 489.904(2). The petition states Batinich is bringing the action both "individually and derivatively on behalf of RAI, L.L.C." It alleges the Renanders "acted in concert to exercise total control of the affairs of RAI, and to make all decisions on behalf of RAI." The petition alleges the Renanders failed to abide by the LLC's operating agreement and that their "actions towards RAI and towards Batinich have been oppressive and in a manner that was, is, and will be, harmful to RAI and to Batinich." The petition then sets out Batinich's demand for an annual meeting of RAI, among other things, and Renanders rejection of the demand. The affidavit not only explains the various demands Batinich made to the Renanders regarding their management of RAI to no avail, it and the petition expressly state that any further demands "would be futile because the wrongdoers—the Renanders—exercise complete control of RAI. A demand that the Renanders, in effect, sue themselves, would surely be rejected." The actions of the Renanders alleged in his petition and affidavit support Batinich's assertion of futility; a specific demand was, therefore, not required.

At the beginning of the remedy and damages hearing, Batinich specifically requested the Renanders be dissociated from RAI. Renander made no response at that time. The court ordered the parties to file post-hearing briefs. In his brief, Batinich again requested the Renanders be dissociated from RAI. Renanders responded in their brief that awarding damages to Batinich, as well as forcing the Renanders out of the corporation, effectively allowing Batinich to take it over for his own benefit, would essentially be a double recovery by Batinich and would be an absurd outcome. After the court entered its order, which included dissociating Renanders from RAI, the Renanders filed a motion to reconsider, and for the first time claimed dissociation was inappropriate because, among other things, Batinich had not made such a demand before filing his petition nor had he made such a demand in his petition. Batinich resisted. The district court denied the motion to reconsider concluding Renanders's motion was "merely a summary reiteration of [their] arguments the Court considered at trial, and should be denied for the reasons set forth in the Court's original ruling and in the resistance . . . filed by [Batinich]."

While Batinich did not make an explicit claim for dissociation as relief in his petition, he did make the claim at the outset of the remedy and damages hearing, to which Renanders resisted on the merits. After the issue was presented and argued by the parties, the district court concluded "the Renanders have engaged in and were engaging in conduct that adversely and materially affected RAI's activities, insofar as they materially breached the operating agreement and their duties and obligations under Iowa Code section 489.409 by

breaching their duty of loyalty and care . . . ." We agree and affirm on the dissociation issue.

### B. *Judgment in Favor of Batinich Individually.*

Iowa Code section 489.901 allows for a direct action by a member of an LLC against another member, a manager, or the LLC itself "to enforce the member's rights and otherwise protect the member's interests" if the member "plead[s] and prove[s] an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the [LLC]." Renander argues Batinich did not plead or prove a personal injury apart from the injury to the LLC. For the reasons that follow, we disagree.

### 1. *Pleading.*

In Iowa, our notice-pleading rules allow for a liberal interpretation of a party's prayer when general equitable relief is requested. *See Lee v. State*, 844 N.W.2d 668, 679 (Iowa 2014). If the relief requested in addition to that contained in the specific prayer fairly conforms to the case made by the petition and the evidence, such relief will generally be granted. *See id.* Moreover, the exact nature of a plaintiff's actions are generally pinned-down and the issues narrowed "at the pretrial conference or during the trial before instruction." *Id.* (citation omitted). In any event, issues beyond the scope of the pleadings may still be "tried by express or implied consent of the parties" and must "be treated in all respects as if they had been raised in the pleadings." Iowa R. Civ. P. 1.457.

Here, Batinich brought claims individually against the Renanders and RAI, asserting Batinich sustained individual damages as a result of the Renanders' actions. The evidence and testimony at the hearing on remedies and damages

clearly established Batinich was attempting to prove personal, individual injuries based on the Renanders' actions. In fact, the default judgment was entered as a sanction because the Renanders failed to comply with the court's ruling to compel evidence, which was arguably sought in support of Batinich's case. Viewing the petition's prayers for relief liberally along with the evidence at trial, we find Batinich sufficiently pled he was personally injured apart from RAI as a result of the Renanders' actions.

### 2. Proof.

The court's order following the hearing on remedies and damages expressly found that Batinich "paid hundreds of thousands of dollars to the Renanders for RAI expenses and taxes, but RAI has provided no records to show what has been done with the money." This finding is supported by testimony and other evidence presented at trial. Arthur could have produced his own evidence beyond his own testimony showing where the money paid by Batinich to the Renanders went. He did not. He merely asked the court to take his word for it—that any loss was to RAI—but the court did not find him to be credible. Consequently, without any accounting by the member-managers, there is no evidence that the money provided by Batinich was for RAI's expenses, was used for RAI's expenses, and even if they were, that the expenses were paid in the percentage for which Batinich was responsible. Clearly the monies paid out of pocket without an accounting are an individual injury to Batinich. That the court determined the amount of money damages should equal the amount it believed Batinich lost as a member because of the Renanders' interference with the sale in 2010 does not change the finding that Batinich suffered an individual

injury. We agree with the district court that Batinich established he suffered an injury beyond those incurred by RAI, such that an individual award of damages was appropriate. We affirm on this issue.

### C. Judgment Against the Renanders.

Renander advances several arguments as to why the judgment against him and Zara was in error. He claims a damage calculation based upon the lost 2010 sale was "overly speculative" as well as futile because the sale did not occur. He also claims the allegations in Batinich's petition were too broad and non-specific to place him and Zara "on notice of the nature and extent of the liability which [Batinich] sought to impose upon them" or establish causation between their breach and Batinich's damages. We disagree.

Starting with the latter assertion first, the record is replete with evidence that Arthur was warned the Renanders would be in breach of their fiduciary duties if they did not accept the 2010 deal—or those negotiated thereafter—so all parties could avoid defaulting on the mortgage, incurring additional fees, and potentially losing the property itself. In a September 2010 letter from Batinich's attorney to the Renanders, several specific examples of the Renanders' breach of their fiduciary duties were given, including Arthur's insistence on retaining land as part of the deal. As one party's representative put it, it was "impossible to deal with [Arthur] when [he would] not even cooperate under circumstances that [were] advantageous to [his] position."

Additionally, though RAI's operating agreement allowed member-managers, "from time to time," to "engage in business enterprises similar to . . . and competitive with the business" of the LLC, that is not what happened

here. The land at interest here was owned by RAI, not the Renanders. Arthur's characterization of his position as he and his wife obtaining land as a "side deal" that would benefit everyone in RAI is simply not credible. The Renanders could have negotiated to buy the land back after RAI and Aamodt sold the real estate, which is what all of the other parties wanted them to do. Instead, Arthur held RAI's sole asset hostage to place the Renanders in a more favorable position without any regard for RAI's overall loss. He simply refused to sell RAI's land unless he and Zara—not RAI—were guaranteed to individually retain some portion or parcel of the land.

The record also shows Arthur used threats of litigation as a means to get other parties—including Batinich—to agree to his terms and force them to settle for less. Arthur even suggested to RAI's attorney that an "aggressive litigation approach vs. Aamodt . . . and maybe [Batinich] was the only hope for putting these players at risk, which [was] the road to a settlement and compromise." Arthur believed foreclosure on the property would force Batinich to sell out his interest in RAI, and he proposed letting the property go to sheriff's sale "so a new group/investors allied with the Renander[s]" could buy the property without having to pay Batinich anything. In his communications with RAI's attorney, Arthur acknowledged Batinich was individually at risk. In response to a letter from Batinich about whether there was a conflict of interest between the Renanders and RAI's attorney, Arthur "observed" that if a conflict was found, RAI would require Batinich alone to pay for a new attorney from Batinich's "share of any future proceeds . . . and to fund [RAI's] future representation". There is

simply no question on this record that the Renanders were "on notice of the nature and extent of the liability which [Batinich] sought to impose upon them."

As to the speculative nature of the sale, it is true that damage claims have been rejected when they are "too speculative." *See St. Malachy Roman Catholic Congregation of Geneseo v. Ingram*, 841 N.W.2d 338, 353 (Iowa 2013). But "[t]here is a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages." *Pavone v. Kirke*, 801 N.W.2d 477, 495 (Iowa 2011) (citation omitted). Specifically:

> **If the evidence is speculative and uncertain whether damages have been sustained, damages are denied. However, if the uncertainty merely lies in the amount of damages sustained, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated. Thus, some speculation on the amount of damages sustained is acceptable; however, overly speculative damages cannot be recovered.**

*Id.* (citations and internal quotation marks omitted). Thus, "while a loss may be hard to ascertain 'with preciseness and certainty, the wronged party should not be penalized because of that difficulty.'" *Hammes v. JCLB Props., LLC*, 764 N.W.2d 552, 558 (Iowa Ct. App. 2008) (citation omitted). "[A]ll that is required to justify an award of damages 'is that the plaintiff produce the best evidence available and that this evidence afford a reasonable basis for estimating the loss.'" *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 688 (Iowa 1990) (citation omitted). Although the "court may not disregard evidence and arbitrarily fix an amount of damage for which no basis in the evidence exists," it does have discretion in determining the damages award, which will not be disturbed on

appeal so long as it is within the range of evidence. *Hawkeye Motors, Inc. v. McDowell*, 541 N.W.2d 914, 917-18 (Iowa Ct. App. 1995).

Here, there is a reasonable basis in the record from which the amount of damages awarded by the court can be inferred or approximated. First, we note that from 2003 to 2010, per Batinich's statement, he paid over $400,000 in RAI bills, including its significant legal costs. A 2011 letter from Batinich to the real estate mortgagee stated that, at that time, he had invested over $750,000 in the real estate, to the Renanders' $50,000. Those figures are on track with Arthur's testimony at the hearing that, at the beginning of the endeavor to buy the real estate, Batinich contributed $250,000, Aamodt $340,000, and the Renanders $60,000, with Arthur going back to Batinich thereafter for additional contributions. There is no evidence in this record showing Arthur contributed anything beyond his $60,000.

Additionally, evidence in the record also supports the court's finding that the property could have sold in 2010 for $4.7 million, if not more, but at the time of the damages hearing, the property was to be sold for $4.5 million. Furthermore, the increase of the amount of debt against the property from 2010 to the time of the hearing was astounding. The district court found Batinich's share of profit from the 2010 sale would have been $499,342, but decreased to $125,462 because of the lower sale price and increased debt. The court determined the difference between the two numbers was the amount of damages Batinich sustained, equaling $373,880.

Though that figure is derived from Batinich's share of the overall loss to RAI, and perhaps quantifiable as a loss to the business rather than an individual

loss, we have no trouble finding the amount of the award was within the range of evidence presented at trial for the losses sustained by Batinich individually, given the amounts found to be contributed by Batinich without any accounting by RAI or the Renanders, along with the Renanders' failure to comply with the court's orders concerning discovery in the underlying case. We therefore affirm the district court's monetary award of $373,880 in favor of Batinich and against the Renanders.[3]

### D. Trial Attorney Fees.

Arthur also challenges the district court's award of attorney fees to Batinich, arguing attorney fees were not recoverable in this action, and if they were, they were excessive. As noted above, our review of the grant is "for an abuse of discretion," and we will only reverse if the district court rested its discretion upon "grounds that are clearly unreasonable or untenable." *Smith*, 885 N.W.2d at 624; *see also Boyle v. Alum-Line, Inc.*, 773 N.W.2d 829, 832 (Iowa 2009). Upon our review, though we do not find the district court's award was based upon unreasonable or untenable grounds, we do find the award must be against RAI rather than the Renanders.

Here, Batinich brought his suit individually and derivatively on behalf of RAI, and his petition prayed for an award of attorney fees. Iowa Code section 489.906(2) permits the court to "award the plaintiff reasonable expenses, including reasonable attorney fees and costs, from the recovery of the limited liability company," if the derivative action is successful in whole or in part. The

---

[3] At oral argument in the case, we questioned whether the amount of the award was too low because of a possible mathematical error in one of Batinich's calculations, but Batinich's counsel was satisfied with the amount of the award.

court's dissociation of the Renanders from RAI to allow the property to be sold *is* a recovery for RAI. Despite the Renanders' statements in the brief to the district court that they wanted a sale of the land "that ultimately benefits RAI as a whole," the district court found, and the evidence supports its finding, that while a sale of the land itself would benefit RAI as a whole, Arthur would not agree to the sale unless he and Zara—not RAI—received a side deal for land. Batinich had to expend personal resources in an attempt to get the Renanders to perform their fiduciary duties as the member-mangers of RAI, resorting to litigation in the end when Arthur could not be reasoned with. Without dissociation, Arthur would likely continue resisting and litigating until he got what he wanted or no one received anything. Batinich's suit was successful, and dissociation of the Renanders from RAI was a recovery necessary to permit RAI to sell its asset.

Additionally, we do not find the award excessive. "A reasonable attorney fee is initially calculated by multiplying the number of hours reasonably expended on the winning claims times a reasonable hourly rate," though the "reasonableness of the hours expended and the hourly rate depends, of course, upon the facts of each case." *Boyle*, 773 N.W.2d at 832 (citation omitted). Thus, the district court must make comprehensive fact-findings setting forth that factors it considered in fashioning its award. *See id.* at 833. Still, there is no precise formula; the court should use its "independent judgment with the benefit of hindsight," looking at "the whole picture," and decide on the appropriate amount. *Id.* at 832 (citation omitted).

Here, the district court found that the 2010 sale would have taken place but for the Renanders self-dealing. Though it is true Batinich did not file his suit

until 2014, the record shows he, his attorney, and others have communicated with the Renanders and RAI's attorney with concerns about the Renanders' actions and failure to agree to a sale unless they individually benefitted since 2010. Since that time, Batinich's attorney has billed almost 400 hours fighting for his client, who passed away during the pendency of this appeal. The hours expended over seven years seems reasonable—particularly given the evidence in this case of self-dealing—and the Renanders do not challenge Batinich's attorney's rate of $200 an hour. Multiplying the two gives an amount of $80,000. This amount is less than the amount RAI still owes its attorney, who filed a lien against the property. Though a more detailed record of the hours spent working on the case would have been helpful, in the context of this unique case, we find the evidence presented by Batinich supports the court's award of the attorney fees against the Renanders, and to remand for a more detailed explanation would not change the outcome; rather, it would continue the proceedings at a greater cost to the parties. Upon our review, we do not find the attorney fee award to Batinich to be unreasonable or untenable, and the district court, therefore, did not abuse its discretion in its determination of the fee amount.

Nevertheless, it is clear that an award of attorney fees under section 489.906(2) must come from the LLC and not the member. *See* 19 Am. Jur. 2d *Corporations* § 2135 (2016) ("[U]nder the common-fund doctrine, the obligation to reimburse the successful plaintiffs in a derivative action falls on the corporation, and not on the losing party, such as the directors charged with mismanagement."); 6 Matthew G. Dore, *Iowa Practice Series: Business Organizations* § 39:18 (2012 ed.). This makes sense, given that a purpose of

creating an LLC is to limit one's individual liability. *See* 5 Matthew G. Dore, *Iowa Practice Series: Business Organization*s § 13:1 (2012 ed.) ("[P]articipants in [an LLC] (members and managers) have no responsibility for company obligations based on their status as members or managers."). Consequently, any award must be against RAI. That part of the district court's judgment that awards attorney fees in favor of Batinich and against the Renanders should be vacated and the attorney fees should be awarded in favor of Batinich and against RAI. We affirm the award in all other respects.

### E. Punitive Damages.

Finally, Arthur argues the court erred in awarding punitive damages against the Renanders. He also faults Batinich's failure to request punitive damages in the petition, but we need not address that contention because we conclude punitive damages should not have been awarded.

To support a claim for punitive damages, a plaintiff must show "by a preponderance of clear, convincing, and satisfactory evidence, [that] the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1(1)(a). It is telling that the district court made no such finding. Although Renander's obstreperous conduct warranted dissociation from the LLC, we do not find that it rose to the level required to warrant an award of punitive damages. Accordingly, we must vacate the award of punitive damages.

### III. Conclusion.

For the foregoing reasons, we affirm the district court's dissociation of the Renanders from RAI and affirm its monetary judgment of $373,880 in favor of

Batinich individually against the Renanders. We vacate the portion of the judgment awarding Batinich attorney fees against the Renanders but find the attorney fees should be awarded in favor of Batinich and against RAI. Finally, we vacate the portion of the judgment awarding Batinich punitive damages. We remand the case to the district court to enter judgment consistent with our decision. We affirm the district court's order in all other respects.

**AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED WITH DIRECTIONS.**