# IN THE COURT OF APPEALS OF IOWA

No. 16-2140
Filed December 6, 2017

**MARTY DESHAW,**
     Plaintiff-Appellee,

**vs.**

**FARMERS SAVINGS BANK and MARK E. WHITE,**
     Defendants-Appellants.
_____

Appeal from the Iowa District Court for Clayton County, John J. Bauercamper, Judge.

A bank and its president appeal a jury verdict in favor of a borrower for fraudulent misrepresentation and nondisclosure.  **AFFIRMED.**

D. Flint Drake and Samuel M. Degree of Drake Law Firm, P.C., Dubuque, for appellants.

Peter C. Riley of Tom Riley Law Firm, P.L.C., Cedar Rapids, for appellee.

Considered by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**TABOR, Judge.**

Farmers Savings Bank and its president, Mark White, appeal a jury verdict in favor of borrower Marty DeShaw in his action for fraudulent misrepresentation and nondisclosure. The jury decided White was complicit with bank customer Jeff Rohner[1] in deceiving DeShaw into mortgaging his home as security for a promissory note to cover Rohner's debt to the bank on his farmland. The bank asserted a claim against DeShaw on the balance due on the note, seeking to foreclose the mortgage. DeShaw denied the claim and successfully asserted the bank's fraud as a defense.

On appeal, White and the bank[2] pose three questions: (1) Did DeShaw prove Rohner's fraudulent intent? (2) Did DeShaw prove White knew of Rohner's fraudulent intent? and (3) Did DeShaw prove White fraudulently failed to disclose material information to induce DeShaw to enter the loan transaction in September 2011? Despite conflicting testimony about the circumstances of this transaction, it was within the jury's prerogative to credit DeShaw's version of events. We find substantial evidence supports the jury's verdict and affirm.

## I.    Facts and Prior Proceedings

A detailed rendition of the facts is critical to addressing the issues on appeal. We start by introducing White, Rohner, and DeShaw.

For nearly three decades, White has served as president of Farmers Savings Bank, which started in Colesburg but expanded to several nearby

---

[1] The district court dismissed Rohner as a defendant after he provided notice of his May 2015 chapter 7 bankruptcy.

[2] Because the bank's liability depends on White's actions, our references to defendant White in this appeal also encompass the defendant bank.

communities in northeast Iowa. In White's words: "If you don't get bigger you get gobbled up." White graduated from Loras College with a degree in finance. He gained additional coursework in agricultural credit and commercial lending. White had a long-time banking relationship with Rohner, a local businessman.

Fifty-seven-year-old Rohner owned and operated Rohner Refrigeration, Plumbing, Heating and Air Conditioning, a fledgling enterprise. Rohner borrowed money for the new business from White in 2009. The bank also held the 2007 note and $90,462 mortgage on the property at issue in this case—a fifty-two acre farm that was mostly recreational timber and generated an annual income of only $2500. The farm was originally much larger, but Rohner sold parcels of tillable land to pay his debts to the bank and "was down to the last fifty-two acres." In addition to his farm debt, Rohner had a loan on his house and "a couple of commercial vehicle loans also on the HVAC business." Rohner "struggled" to make his quarterly payments on the farm in 2008 and 2009. Before the quarterly payments were due, White advanced Rohner two smaller loans—$6500 on April 14, 2009, and $9000 on March 15, 2010, which were secured by equity in the farm—noting Rohner needed "a little operating money" for his business. During his financial struggles, Rohner befriended DeShaw.

DeShaw attended high school with Rohner's son; they hunted and rode four wheelers in Rohner's timber. After high school, DeShaw worked in manufacturing before taking four years to care for his grandmother, who suffered from dementia. When she died, he returned to manufacturing work. When he started receiving unemployment in 2009, DeShaw worked as an unpaid intern for Rohner to learn the HVAC trade. DeShaw owned two houses. His residence on Colesburg Road

was debt free; he paid his grandmother half the value and inherited the other half from her estate. DeShaw had lived there for seventeen years. DeShaw also rented out a house in Guttenberg purchased with a Fidelity Bank loan and mortgage.

**Delivery of Colesburg Road Abstract to White.** Key trial testimony focused on DeShaw's home on Colesburg Road. Witnesses offered the jury diametrically opposed reasons why DeShaw delivered the home's abstract to the bank in February 2011.

*White's testimony.* White characterized Rohner as "a chronic past due" customer. The banker's comment sheet memorialized Rohner's frequent requests for extensions on existing loans, as well as new, smaller loans to increase his cash flow. If any debtor was more than thirty days past due when the bank created its quarterly reports, the loan was dubbed "troubled debt." White explained, "[M]y board frowns on troubled debt."

In December 2010, White's patience with Rohner's debt level and payment struggles ran out. The banker urged Rohner to sell the last portion of his farm— the timber. But Rohner replied: "This is a family farm. This is all I have left." Rohner proposed: "If I can find an investor to pay it down, if I find a plan, will you listen?" White agreed to listen.

According to White, during a January 8, 2011 meeting at the bank, Rohner and DeShaw presented him with a plan for DeShaw to invest in Rohner's farm.[3]

---

[33] DeShaw insisted he did not attend this meeting and first met White several months later in September 2011. In addition, the January 8 meeting was not listed on White's comment sheet concerning Rohner's loans. Neither did White start a comment sheet on DeShaw

White recalled that Rohner walked in, introduced DeShaw as his employee, and reminded White of his agreement to listen if Rohner found an investor. White said Rohner convinced DeShaw the farm was worth between $175,000 and $200,000 and the bank was not being fair to Rohner in seeking a deed for $130,000. Rohner proposed the farm be sold for $160,000, that DeShaw "would come up with $80,000" and pay Rohner's $130,000 obligation down to $50,000, then Rohner would reimburse that $50,000 to the bank in monthly payments over twenty years.

White thought Rohner's proposal was workable and asked DeShaw if he had $80,000. DeShaw replied he did not, so White allegedly told DeShaw, "I need the financial application. I need to know what I'm working with." White helped DeShaw fill out a loan application by asking him questions about his assets and liabilities and recording his answers on the form. After DeShaw approved White's compilation of his assets and liabilities on the loan application, White dated it January 8, 2011, and DeShaw signed it.

White told DeShaw he could have the same deal as Rohner: "[Rohner] borrows 50, you borrow 50, you have to cough up $30,000." White also told DeShaw, he wanted a first mortgage on the Colesburg house and a second mortgage on the Guttenberg house "so I have enough collateral." According to White's testimony, DeShaw agreed to "the first but I won't give you a second. If this doesn't work out, I am not going to be homeless." White understood DeShaw

---

on January 8. White testified, because he made no loans on January 8 to DeShaw, he wouldn't have started a loan file. As to Rohner's comment sheet, White testified: "I'm much more diligent when I have an issue . . . again, not enough hours in my day . . . . I have been chastised about this by management because I'm not good at comments."

would give him a mortgage on his Colesburg Road house and would deliver that abstract to the bank, which DeShaw did in February 2011.

White claimed as the meeting continued, he "went to the assessor's card" to see what the Colesburg Road property was worth, which was $57,000.[4] White allegedly told DeShaw that the Colesburg Road property "has got to appraise for at least $50,000, or this deal isn't going to go through." White required Rohner's proposal be reduced to writing and volunteered the name of an attorney, Kim Lange, who could "put the contract together for the sale between the two of you." According to White, Rohner and DeShaw agreed, and White contacted Lange.

White pulled DeShaw's credit report at 11:05 a.m., January 8, 2011, learning he had a good score. White believed he ran it "immediately following the meeting." White told the jury, "I have to have an application, either verbal or in writing, to pull a credit report," but "it's best to have a written application."

*DeShaw's testimony.* DeShaw aspired to run his own HVAC company. His sister and cousin testified DeShaw learned in 2010 that such a business might be for sale in Elkader. DeShaw testified Rohner said he talked to White about loaning DeShaw money to buy the Elkader business and White indicated his willingness to do so if DeShaw had collateral.[5] From that conversation with Rohner, DeShaw understood he should deliver an abstract to the bank. DeShaw discussed purchasing the HVAC business with Rohner because DeShaw did not have the necessary licenses to operate the business and Rohner did. DeShaw proposed

---

[4] The loan application White said he helped DeShaw complete at this meeting valued the Colesburg Road house at $100,000.
[5] At trial, Rohner denied discussing the Elkader business with DeShaw. White similarly testified to having no knowledge of DeShaw's interest in the Elkader purchase.

buying the Elkader business and combining it "with Rohner Refrigeration and operat[ing] under his license."

In early February 2011, DeShaw dropped off the abstract for his Colesburg Road home at the Elkport/Garber bank branch to obtain a loan to buy the Elkader HVAC business. DeShaw entered the bank and told a teller, "Mark White is expecting this." DeShaw did not discuss buying an interest in Rohner's farm with the teller. White did not work in that branch and was not present.

DeShaw also testified Rohner "had periodically discussed" DeShaw buying a half interest in Rohner's farm "and that is when *they* come up with the contract for me purchasing half, where $30,000 would come out of my Guttenberg [rental] house." (Emphasis added.) DeShaw was willing to provide a mortgage on his Guttenberg rental to purchase half of the farm but was not sure when he actually saw the sale contract—Rohner "didn't bring it out then. He waited. I don't know why." It is undisputed attorney Lange prepared the real estate contract and faxed it to White on February 11, 2011.[6]

**Title Issue on Colesburg Road Abstract.** White also asked Lange to provide a title opinion on DeShaw's Colesburg Road property. On February 24, 2011, her preliminary opinion stated "marketable title" was vested in DeShaw "by

---

[6] The contract provided DeShaw would pay $80,000 and $30,000 "has been paid." DeShaw was to make annual payments of $4800 at 7% interest on the $50,000 balance. As to who employed Lange to draft this contract, Rohner testified:

> Q. Did attorney Kim Lange ever represent you? A. She may have. I guess I'm not—I don't remember.
> Q. Was she your lawyer to prepare a contract between you and Mr. DeShaw [sometime in February 2011]? A. After our deposition last time, I kind of remembered something like that.
> Q. At the time of your deposition, you said that she wasn't your lawyer when she prepared that contract; right? A. Correct.

virtue of a warranty deed dated April 22, 1998" and by virtue of the joint tenant's death as proven by the July 24, 2007 filing from the estate of DeShaw's grandmother. To provide clear title, Lange required White to "[o]btain an affidavit of the surviving joint tenant prior to closing."

DeShaw did not know Lange before February 24 and asserted he had not told White the bank "could have a lien or a mortgage on [his] Colesburg house in connection with buying an interest in [Rohner's] farm." Rohner disagreed, stating DeShaw knew he would have a mortgage on his Colesburg Road house.

**DeShaw Loan in March 2011.** As with the reasons for DeShaw's delivery of the Colesburg Road abstract to the bank, the jury heard diametrically opposed testimony on why DeShaw obtained a small loan in March 2011.

*White's testimony.* On March 4, 2011, White ran a second credit report on DeShaw, again observing a "very good" score. This report contained a "loan application date" of March 30, 2011, even though White testified to a conversation with Rohner two weeks earlier. On cross-examination, White stated: "Why we ran it in early March, I'm not sure." "I had to have it thirty days prior to making the loan" to DeShaw.

In mid-March, White pressured Rohner to pay before the upcoming quarterly report: "[I]f you don't have it, we're done and I'm foreclosing." Rohner said he would talk to DeShaw. White recalled hearing back from DeShaw, who confirmed he wanted to continue with the farm deal. White said he told DeShaw he needed "a payment by March 30th" or the bank would be "forcing the issue." "So [DeShaw] walked in on March 30th, signed a note for $3500, and took care of the problem." Rohner's debt for the farm remained at $130,000, and because it

was worth at least $160,000, White believed it was "still a good deal for them." White claimed DeShaw took out the loan in March 2011 "to hold the status quo" on the farm so he could still do the $80,000 deal. White first entered a comment on DeShaw's loan sheet on March 30, 2011.

But White's testimony was at odds with his March 30, 2011 comment sheet placed in Rohner's loan file:

> [Rohner] just can't afford the debt on the farm and must sell. [Rohner] has found a buyer (Marty DeShaw), but can't sell until judgments are cleared up. They had it worked out that [DeShaw] would buy on contract, but with the huge medical judgments, can't. At this point we are stepping in. Asked if [Rohner] would give us a deed in lieu and he said yes if we sell to [DeShaw]. We said that is agreeable as long as [DeShaw] is the highest bidder. [DeShaw] is willing to pay a minimum of $140,000 and will probably go to $150,000. He has two properties clear or almost clear for the down payment. Proceeding with attorney John Freund to get [the farm] into [the bank's] name.

White testified, despite his comments, he did not have "absolute certainty" judgment liens existed against the farm. At trial, White asserted he did not know the February 2011 sales contract was not feasible until the abstracting company's May 2011 lien search. But on cross-examination White admitted:

> Q. And the comment sheets are things that you keep as a part of the recordkeeping that the regulatory authorities and bank examiners will look at when they come in and evaluate your loan portfolio; correct? A. Yes.
> Q. And so you try to be as accurate as possible when you make comments in the comment sheet; correct? A. [Rohner] told us that they are out there, and we were hoping they weren't, but—
> Q. Is there anything in your entry . . . that says anything about possible or potential judgments? A. No.

Rohner's testimony also casts doubt on White's asserted belief the February 2011 contract was viable when DeShaw took out the March 2011 loan. Rohner testified, before the bank's May 2011 lien search, he knew he had been

sued and that *judgments* had been entered against the farm for medical bills, attorney fees, and unpaid business bills.

White claimed he knew the Colesburg Road property was free and clear based on (1) Lange's preliminary title opinion and (2) DeShaw's January 8, 2011 loan application. But White's evasive responses when asked about his March 2011 characterization of the Guttenberg rental property as "almost clear" bolsters DeShaw's claim he signed the loan application at the same time he signed the loan documents—September 2011 and not January 2011:

> Q. You're saying your state of mind was the Guttenberg house was almost free and clear; correct? A. There was debt against it. [DeShaw] had already told me that he will not give me that house.
> Q. Your words were, "He has two properties clear or almost clear for the down payment." That's what you wrote in the comment sheet that the regulators look at; right? A. Yeah, but he wasn't going to give me both of them.
> Q. Do you consider a $45,000 mortgage on an $80,000 property almost clear? Really? A. He wasn't going to give it to me anyhow. [DeShaw] had already made it very clear. He didn't give me the abstract. I was not going to get that [Guttenberg] house.
> Q. My question is: Do you want the jury to believe that you think a $45,000 mortgage on an $80,000 property is almost clear? It's a yes or no question, sir. A. It's an opinion.

Further, White hedged in his testimony concerning the signing date of the loan application:

> [Deshaw] testified that at some point he gave me this information. This was recognizable to him . . . . My recollection is, I'm 99% sure, he signed it in January [2011]. [DeShaw]'s recollection is he signed it in September [2011]. Banking law requires that I have a signed application at time of closing. So whether he signed it in January or he signed it in September at that closing, it really makes no difference . . . . The big thing is it had to be signed prior to the closing [of DeShaw's loan for $152,800] in September [2011].

*DeShaw's testimony.* DeShaw testified to a different path leading up to his March 2011 loan for $3500. Rohner told DeShaw he was waiting for earnings from

a job and "had to pay up the interest on his loans, and that if I borrowed the money, [Rohner] would pay me back right away." DeShaw agreed to help, and on March 30, signed a three-month personal note with the bank. DeShaw believed, "within a matter of a month or two," Rohner had repaid this loan. But the bank's records show otherwise.

*March 2011 loan documents.* Although DeShaw did not receive the loan proceeds, the bank's "disbursement request and authorization form" stated the note's proceeds were paid directly to him. A related bank debit, dated March 28, 2011—two days before DeShaw signed the note—showed a $3473.00 transfer from DeShaw's account was applied to two different loans. A handwritten note on the debit states: "The money was paid on interest on both of Jeff Rohner's loans." But the application of the loan's proceeds to Rohner's loans is not listed on DeShaw's comment sheet. White's notes on Rohner's comment sheet stated the bank agreed to give Rohner "one more extension." White testified "the two [Rohner loans] that [DeShaw] took care of were the larger loans." On cross-examination, White admitted the loan's $1974.20 in closing costs assigned to DeShaw included $50 charged by attorney Lange to prepare the February 2011 sales contract for $80,000 that White asked her to draft.

The bank processed the debit on March 30, the same day DeShaw signed the note. But White had already extended Rohner's loans on March 28, 2011, "to allow more time for this farm transaction to work itself out." On cross-examination, White blamed the bank's computer systems for the differing dates on the documents, stating he "had to backdate" so Rohner's loans would not be listed as

"bad debt" in the March quarterly report[7] and the bank gained no advantage in using the differing dates. But White's explanation shows his willingness to backdate official bank documents.

**White's Lien Search on the Farm.** White requested a formal lien search on the farm. On May 13, 2011, the report showed the farm was subject to four creditors' judgments of about $25,000 and to unpaid real estate taxes. White claimed he did the lien search to protect DeShaw, who would have assumed Rohner's liens under the February 2011 contract for $80,000. White claimed he then "advised [DeShaw] against buying or entering into the [February 2011] contract agreement" because the lien search "pretty much throws [the February 2011 contract] out."[8] White also "talked to [Rohner] and said [the contract for $80,000] is not going to work. We have to have a deed in lieu of foreclosure." White did not note these discussions on the loan comment sheets for either Rohner or DeShaw. On cross-examination, White admitted that one purpose for the lien search was to provide the bank's attorney, Freund, with the report so he would know who to serve with the voluntary-foreclosure documents.

White claimed DeShaw "still felt, 130, 140, 150, is still a good deal for him. So they told me to proceed on, we were going to do a deed in lieu, the bank would own it, the bank would sell" the farm to DeShaw. The "big thing" for White was

---

[7] Rohner's status as a nonpaying debtor continued the next month. On April 5, 2011, the bank sent him a letter about his delinquent loan for the purchase of a vehicle and trailer. When Rohner did not respond, White's April 29 letter told him to pay or make satisfactory arrangements within twenty-one days or the bank would "commence collection action."
[8] DeShaw denied having such discussions with White.

getting the farm in the bank's name so White "could control the destiny, whether I call a realtor or I work something out" with DeShaw.

DeShaw did not see White's lien report but found out about the farm's liens "sometime in the spring of 2011" and was no longer interested in a contract to purchase for $80,000. DeShaw knew if he bought part of the farm, "the judgments would still be on the property, and they would affect me." According to DeShaw, when the $80,000 contract was dropped, Rohner then approached him with a "solution that would allow [Rohner] to get around" the judgment liens.

DeShaw testified:

> [Rohner] said *he had discussed it with Mark White, and they came up with the idea* of [Rohner] to sign in lieu of foreclosure note, the bank would take it back, and that would dismiss any judgments against it. Then I would buy it out. It would be in my name no more than three months. [Rohner] would file bankruptcy and take it back [free and clear].

(Emphasis added.) DeShaw discussed this plan only with Rohner, not with White or anyone else at the bank. Rohner, who had taken bankruptcy and had executed a reaffirmation agreement with the bank in the past, understood if he gave the property back to the bank, "took bankruptcy, those judgments would be extinguished if [he] then took the property back." According to Rohner, before his voluntary foreclosure in May 2011, he had "some discussions" with DeShaw about "buying the farm or an interest in the farm." But he and DeShaw had "a lot of discussion about it after [Rohner] signed the voluntary foreclosure."

At this point, DeShaw was still considering buying the HVAC business, but when he broached the subject with Rohner, he "would talk me out of it again, and we would just go back and forth on it." DeShaw ultimately decided he was willing

to help Rohner and take temporary title to the farm because he "felt sorry for him. It was in his family . . . it was breaking his heart" and "he wanted to keep it. And it was financially beyond me to buy and keep. And [Rohner] found a way where he could clear his debts, and he would take it back." DeShaw was not aware Rohner had filed for bankruptcy twice before 2011.

**Rohner's Voluntary Foreclosure—May 2011.** White explained the steps he took for the voluntary foreclosure as "we identify the debt against the farm and debt against the house and debt against the commercial business. I sent all the paperwork to attorney Freund" and "gave instructions" to get the farm out of Rohner's name and extinguish the judgment liens.[9] On May 23, 2011, Rohner executed a deed and agreement of voluntary foreclosure in favor of the bank. Rohner knew his debt secured by the farm was paid off, the judgment liens were extinguished, and his unsatisfied debt was $115,100. In sum, Rohner extinguished around $119,800 of his $234,937 debt with the bank.

On June 1, 2011, attorney Freund, on behalf of the bank, served notices on the four lienholders by certified mail. *See* Iowa Code § 654.18(3) (2011) (giving lienholders thirty days to redeem). Also on June 1, White wrote on Rohner's comment sheet: "Notices sent, would like to close [with DeShaw] in June but the thirty days won't be up, will have resolved by early July, hoping."

**Bank Owns the Farm.** When the lienholders took no action, the bank recorded its deed and the voluntary foreclosure agreement on June 23, 2011. But the sale to DeShaw did not close in early July. White needed to have the property

---

[9] White explained the creditors would still have judgments against Rohner but not a lien on the farm property.

appraised and also needed to clear up the title issue. White continued discussions with DeShaw and asserted whether to go forward was up to DeShaw. "I wanted 130 out of it, whether [DeShaw] took it over or I sold it to someone else. I didn't really care."

DeShaw acknowledges he had phone conversations with White before closing his September 2011 loan with the bank. But DeShaw claims he told White he was "not willing to give a mortgage" on the Colesburg Road property in connection with the farm deal. At trial, DeShaw explained why he was willing to provide a mortgage on his home to further his purchase of the Elkader HVAC business but not for a loan on the farm: "Because the business would be for myself, and dealing with someone else, just on the faith that they were going to make the payments, I was not willing to put the only house I had free and clear up for collateral."

*Appraisals.* White explained: "If you're taking a mortgage, you have to have an appraisal." On July 1, 2011, White ordered an appraisal on the Colesburg Road home, telling the appraiser DeShaw was "refinancing (down payment loan)" and the valuation would be used for a mortgage. On the same date, White ordered an appraisal of the farm, stating DeShaw was purchasing the farm for $150,000 but "there is no purchase agreement at this time."

At the end of August 2011, the completed appraisals valued the Colesburg Road home at $82,000 and valued "the market cash value of the [timber] being purchased by Marty DeShaw" at $153,737. White then proceeded on the loan, "[w]e ordered the deed packages and eventually prepared the closing docs for the loans in September." On behalf of the bank, White signed and notarized a deed

transferring the farm from the bank to DeShaw on September 11, nine days before the transaction closed. White explained he probably received the deed package on September 11 and "just took care of business and signed it." White told the jury the loan closing was delayed due to Lange's title objection.

*Title Objection.* White testified he asked DeShaw for help in clearing title to the Colesburg Road house and DeShaw then "talked to his attorneys," who e-mailed or faxed an affidavit to White. White then "forwarded it on" to Lange, and Lange cleared title on the afternoon of September 19, 2011.

But on cross-examination, White admitted: (1) the document he presented as a newly prepared affidavit was a December 2008 affidavit from DeShaw's sister, not DeShaw; (2) this 2008 affidavit would have been in the abstract before Lange's February 2011 *preliminary* title opinion; and (3) Lange cleared title to the Colesburg Road house based on her examination of the 2007 "Report and Inventory" of the estate recorded in the county clerk's office. Also on cross-examination, DeShaw's counsel pointed out Lange's original requirement asked White to obtain an affidavit of the surviving joint tenant before closing. White responded he had "no idea" who that would be and was evasive when questioned about the estate inventory:

> Q. Do you see . . . who is the co-tenant, co-owner with [the grandmother] on this house? A. It says Marty DeShaw.
> Q. Would you agree that Marty DeShaw is the joint tenant that Miss Lange is saying you need affidavit from [to clear title]? A. Again, I'm not an attorney . . . . I mean, that's why banks get title opinions, so attorneys can tell us, and when she told me we we're good to go [in her September 19, 2011 e-mail], I assume she reviewed all of these documents . . . .
> . . . .
> A. Okay. According to the documents, yeah, [DeShaw] was co-tenant.
> Q. And what Kim Lange is saying is obtain an affidavit of surviving joint tenant prior to closing. That means get an affidavit

from Marty DeShaw; right?  A. Again, I'm not an attorney . . . .  You're asking me to make an opinion of law . . . .

Q. All right.  And you didn't get an affidavit from the co-tenant, Mr. DeShaw, did you?  A. I sent it to an attorney . . . .

**DeShaw's September 2011 Loans.**  DeShaw testified he first met White on September 20, 2011, while signing the loan documents to temporarily purchase the farm from the bank.  DeShaw also gave White the information to fill out the loan application.[10]   DeShaw's signature is his only contribution to the loan application, and DeShaw does not dispute he signed it.[11]

According to DeShaw, on September 20, he and Rohner were working on a heating job near Colesburg, DeShaw still as an unpaid intern.  Rohner was driving and "out of the blue" said to DeShaw, "Let's swing by the bank, and you can sign the papers on that loan."  DeShaw described what happened in the five to ten minutes he and Rohner met with White at his Colesburg office:

> [W]e walked in.  [Rohner] said, "I have Marty [DeShaw] here to sign the papers."  [White] had them all ready on his desk.  And I was just told to sign here, sign here.  I signed everywhere I was told.  And [White] said, "I need you to sign this loan application to make this legitimate," and I signed it, and he said he would fill in the rest.

"Everything was put with the signature on top, this stack, this stack, this stack."  DeShaw did not ask how much he was borrowing because it "was supposed to be a temporary, three-month deal" and he trusted Rohner.  DeShaw gave White the

---

[10] The loan application listed (1) DeShaw's home on Colesburg Road at $100,000 in value and no debt and (2) DeShaw's Guttenberg rental property at $80,000 with $45,000 in debt to Fidelity Bank.   He had no other debts and $1575 gross monthly income—$1200 unemployment payment and $375 rent payment.

[11] In his deposition *and* at trial, Rohner testified there was only one meeting at the bank between the three men and it occurred in the fall of 2011.  But on cross-examination, Rohner stated: "Q. If I told you that Mr. White testified in his deposition that he first met with you and Mr. DeShaw on January 8, 2011, at the bank to have a discussion about that, could that be right?  A. Yeah."

name of his insurance company and information about his vehicles and employment so White could fill out the credit application. DeShaw testified this meeting was the first time he, Rohner, and White were all together and White "never really spoke" to him other than just to tell him where to sign. But DeShaw admitted no one at the bank lied to him to get him to sign the documents. And DeShaw admitted he was foolish to not read the documents before signing.

In contrast, White testified he went over each of the documents with DeShaw and specifically pointed out the mortgage on his Colesburg Road home. DeShaw borrowed $154,874 in two, twenty-year promissory notes—one for $66,000 and one for $86,874. White testified the farm "is worth roughly 150 and the loan is worth 150" and the bank would not "finance 100%," so DeShaw did not receive proceeds because he was "pledging the house for the down payment on a farm."[12]

---

[12] Both note disbursement pages stated DeShaw received the note proceeds directly and the other disbursement option: "Deposited to Account # _____" was left blank, even though DeShaw did not receive the note proceeds. The interest rate was around 6%. DeShaw paid $1974.20 for fees, costs, and the title opinion. For each two-page note, DeShaw signed the second page and other documents—an errors and admissions agreement, a disbursements page, and a notice of final agreement. DeShaw also signed two documents relating to insurance on his Colesburg Road home.

The bank's summary of the loans, a document DeShaw *did not* sign, stated:

| | | |
|---|---|---|
| Loan for the farm | $ 86,874[13] | |
| Loan for the house & farm | $ 66,000[14] | |
| Net | $152,874 | |
| Less closing fees | | -$   1974 |
| Less pay off [DeShaw's March 2011] loan | | -$   3656 |
| Net deposit | | $147,244 |
| Balance applied to Jeff [Rohner]'s loan per Marty [DeShaw] $147,244 | | |

White contended this summary also showed DeShaw the mortgage on his Colesburg Road house.

The summary reveals Rohner did not pay off DeShaw's March 2011 loan for $3500 as DeShaw believed. Rather, the bank rolled DeShaw's March loan into the September 2011 transaction. DeShaw testified he was unaware the March loan was in default because the bank did not send him any default notices after the loan went past due in June 2011. White testified he didn't send any thirty-day "right to cure" letters on the March loan "because this was all in progress." DeShaw did not know Rohner had not paid the March loan until White's testimony at trial.

To secure the notes, DeShaw entered into an open-ended $180,000 "purchase money mortgage" on the farm, which he signed twice on the last page. White notarized his signatures. The second mortgage was a $90,000 "purchase money mortgage" on his Colesburg Road home. Similarly, DeShaw signed twice and White again notarized DeShaw's signatures. Thus, DeShaw signed $270,000

---

[13] White arrived at this amount as the "balance of what we agreed to as far as paying off [Rohner]'s notes plus closing fees for abstract, title opinion, recording, doing all the closing fees."

[14] White arrived at this amount as being 80% of the appraised value of the Colesburg Road house. His "standards and regulations" required a residential mortgage to have 20% down.

in mortgage encumbrances for around $153,000 in loans after Rohner had discharged around $120,000 in debt in the voluntary foreclosure.

DeShaw and Rohner returned to Rohner's vehicle and drove to the shop. Rohner had told DeShaw his debt was around $90,000; DeShaw believed he was borrowing that amount. DeShaw testified:

> We went into the shop, and I had asked [Rohner]—I had looked through some of the papers and seen there was a lien against my house, and I asked him, "Why is there a mortgage against my house?" And he said, "I don't know, but I swear, I will pay this. Don't worry about it. This is only temporary."

At that time, DeShaw trusted Rohner would make the payments. He did not contact White because he trusted Rohner's assurances "[i]t was only temporary, and I would have my house back."

White explained why the September 2011 loan to DeShaw increased from the $120,000 debt extinguished in the voluntary foreclosure and from the $130,000 he had testified he wanted to receive: "Once we got the appraisal . . . we were looking at fair-market value, what's fair. And that's where we came up with the [$150,000, which] took care of all the farm debts. *It did clear up the commercial debts*" on Rohner. (Emphasis added.) On cross-examination, White testified, "I don't think it's right for the bank to pocket the difference" "between 147 and 119," the difference "is not the bank's money."

> Q. So the bank took it? A. *No. I gave it to Jeff [Rohner].* I mean I applied it to his debt. I mean, you want to be fair about it.
> . . . .
> Q. . . . Are there documents to show that? A. . . . I would have to go back and restructure and see what all of those were, because I don't think we have those all here . . . .
> . . . .
> Q. . . . The effect of this transaction was, you got the same security you had taken in satisfaction of the debt, [the farm,] plus

[DeShaw's] house free and clear, and were able to make then a significant pay down on the debt of somebody who you have already called someone who was chronically in default?  A. Yeah, there was a substantial pay down to Jeff [Rohner] because—at that point we owned it.

(Emphasis added.)

Further, White was not willing to finance more than $150,000.  "But in that 150 we also included the [$3500] debt of [DeShaw's] that he took out in March.  So [his] debt wasn't going to be three notes; it was going to be two notes."    White asserted, once the bank had the farm, legally, he could sell it for whatever he wanted and was not limited by the amount of debt Rohner satisfied in the May voluntary foreclosure.  Specifically,

Q. It wasn't like this was some special transaction that wouldn't have benefited the bank any different than you could have done with anybody else?  A. The only one that benefited was probably Jeff [Rohner] because I allowed him to put it on his debt.  Actually, I could have taken the [excess over the farm debt].  We owned the farm.

At trial, DeShaw argued the $30,000 the bank received "over and above" the $120,000 Rohner discharged in his voluntary foreclosure was newly secured profit for the bank.  When Rohner was asked whether the $120,000 debt he discharged in his voluntary foreclosure grew to $150,000 from May to September 2011, Rohner replied: "I guess I don't know.  There may have been some late charges.  I guess I don't know how that works."

**Payments on DeShaw's September 2011 Loans.**  DeShaw testified he did not make any payments to the bank in connection with the September 2011 loans.  DeShaw could not afford to pay even one-half of the monthly amounts due

on those loans in 2011—"[i]t was well beyond my income." It appears Rohner made the payments on DeShaw's loans.

At trial White first testified, "The payment was made, it didn't go past due, I didn't look at it." But during White's 2016 deposition shortly before trial, he acknowledged knowing the September 2011 transaction with DeShaw was really Rohner's loan:

> Q. And do you recall after the closing getting any contact from Mr. DeShaw complaining about the transaction. A. The only complaints were *when Jeff [Rohner] went past due* when [DeShaw] was getting nasty letters [from the bank] saying pay up because . . . then he was upset [Rohner]'s not making the payments.
> . . . .
> Q. I thought this was Mr. DeShaw's loan? A. Yes. And that caught me off guard when the first payment was made, because [Rohner] said it was on automatic payments [but] nothing was on automatic payments. [Rohner] started sending us checks and his story to me was I'm taking [DeShaw]'s paycheck, [DeShaw] is working for me, and this is [DeShaw]'s payment. Okay. I thought it was odd that [Rohner] was making the payments, but [he had explained it].

At trial, White claimed his deposition testimony contained errors—the first excerpt above was made "without reviewing the facts" and his second excerpt described "what happened in early [20]12." White's new version at trial was that when DeShaw's loan payments were "past due," White "researched it" and discovered Rohner "would call in, transfer money into [DeShaw]'s account, and then [DeShaw] was transferring the money from his account on the loan. The loan payments were made by [DeShaw], but it looked like the money came from [Rohner]." White then confronted Rohner and asked, "'What's going on here?' 'Well, that's [DeShaw]'s pay. We are still working together, and that's how I pay

him.' Okay. I guess I'm getting my payment . . . ." But White did not introduce any documents showing this process was used.

Although Rohner did not follow through on what DeShaw believed was their plan—DeShaw taking "temporary" ownership and Rohner immediately declaring bankruptcy and taking back the lien-free farm, DeShaw stated he did not go talk with White until "at least a good four or five months after Rohner [had made] up excuses that he hadn't filed bankruptcy and taken it back."

For yet another variation, Rohner claimed, in September 2011, Rohner and DeShaw entered into an oral agreement that Rohner would make half of the payment DeShaw owed to the bank, DeShaw would pay the other half, and eventually Rohner would re-own *half* the property. Rohner claims he discussed this plan with DeShaw, not with White. In support of the oral agreement, Rohner claimed to have paid DeShaw the entire time DeShaw worked for him; but Rohner did not introduce any documentation from his business to support this assertion. Under the plan, "the bank took [all] the money out of [Rohner's] account, and then [Rohner] took the money from what [DeShaw] was otherwise owed as wages." Rohner set it up with the bank so the whole payment on DeShaw's loans came from Rohner's account. DeShaw "was supposed to set up an account for his half, but he didn't."

But Rohner admitted he had no record showing he "ever took any money" from DeShaw. White testified DeShaw had an account at the bank and Rohner was incorrect in asserting DeShaw did not. In other testimony, Rohner stated he paid DeShaw mostly in cash because Rohner "had a problem with checkbooks."

In contrast, DeShaw testified Rohner paid him wages only for the last year he worked for him and paid by check.

**Maintenance of the Farm.** DeShaw testified Rohner acted as if he was still the owner of the property after DeShaw's September 2011 purchase of the farm. For example, Rohner's family would use the property to ride four wheelers. Also, Rohner bought a trailer home and moved it to the property for camping. Rohner mowed the farm or paid someone else to mow.

**DeShaw Loans in Default in 2013.** When DeShaw got bank notices of nonpayment of the farm debt, he would confront Rohner, who replied that he periodically would just not pay and then "he would catch the payment up." At some point, DeShaw listed the farm for sale, but Rohner got angry and talked DeShaw into withdrawing the listing.

Rohner testified he did not know when the bank stopped taking payments *out of his account* to pay DeShaw's loans. White sent DeShaw a "notice to cure" on June 20, 2013. The non-payment notice upset DeShaw, and even though White claimed to be unaware of any "side agreement" between Rohner and DeShaw, White was willing to talk to Rohner. White testified:

> [DeShaw's] take on this was [Rohner] got me into this mess. [Rohner] should make these payments. And I told [Deshaw], "I'll talk to [Rohner]. I'll do what I can, you know. You're my customer. I'll do what I can. If you want me to talk to [Rohner], I'll talk to [Rohner]." So, I talked to [Rohner].
> . . . .
> Q. . . . [S]o you were going to see if Mr. Rohner was going to do it? A. Yes.
> Q. What did he say? A. I talked to [Rohner] about it, and said, "Hey," and [Rohner] said, "Well, I should—" you know, [Rohner] kind of felt responsible for some of this, yeah. "I should probably do something here."

According to DeShaw, he talked to Rohner about the notice and Rohner told him: "I am not paying it anymore"; DeShaw could sue Rohner and take his house.

According to Rohner:

> Q. Isn't it true that the relationship between you and Mr. DeShaw broke up when you quit paying the bank on the loan? A. No.
> Q. You dispute that? A. I waited until he had a job before.
> Q. Once he had a job, you quit making payments to the bank? A. Yeah, it was around that time.

DeShaw listed the farm for sale at $150,000. He was good friends with Rohner's parents and asked for their help. They agreed to speak with Rohner. DeShaw quit working for Rohner. White testified Rohner's earlier willingness to help with the payments ended when Rohner had a falling out with DeShaw:

> I get a phone call and [Rohner] was really, really mad . . . . There was a conversation between [DeShaw] and . . . [Rohner's] parents. There must have been words between the parents and [Rohner] that upset [Rohner]. I think [Rohner] and [DeShaw] had a conversation after that that didn't go so well. My next conversation with [Rohner] was basically, "I'll be damned if I pay anything on that." So they had a falling out and it wasn't pretty.

At trial, Rohner blamed DeShaw for the demise of their September 2011 oral agreement in which Rohner would *rebuy* one-half—DeShaw had a "negative mind" in 2013:

> That's when DeShaw said he didn't want to make payments anymore; he was done, and just walked away.
> . . . .
> Q. So you stopped making your payments? A. Yeah, once it fell apart. *I couldn't afford the whole thing*. That was part of going in on the [oral] agreement, with the half.
> . . . .
> Q. Did you have a concern that if you made your payments, that at some point, because of the attitude, [DeShaw] wouldn't deed the property to you anyway and you would never get your interest? A. . . . [Y]eah, it was basically just like throwing away money, you

know. But, you know, I was willing to step up to the plate and have faith, I guess.

(Emphasis added.)

On July 26, 2013, White and DeShaw talked about DeShaw's efforts to sell the property. DeShaw believed the bank had to consent to a sale because of the mortgages. DeShaw told White he had an offer for $125,000, and after talking, they agreed that wasn't enough; White and DeShaw passed on the offer. Also on that date, White composed a letter to DeShaw stating he had ten days to resolve his nonpayment or the bank would turn the matter over to its attorney.

But instead of turning to attorneys, on August 30, 2013, the bank sent DeShaw another notice of default. DeShaw hired local attorney Mike Schuster, who asked the bank for documents. According to DeShaw, White refused to provide any documents and Schuster then referred him to attorney Peter Riley. Riley then asked White for documents, providing DeShaw's signed authorization. DeShaw testified White asked him to come to the bank for a meeting. When he walked in, White said, "This shit really pisses me off," threw down DeShaw's signed authorization, and added, "I am not sending them a damn thing." White told DeShaw they could resolve the matter without lawyers. DeShaw testified:

> [T]hat's when [White] wrote out for me to call the lawyer off, he said, "If you sign this, I realize this is not your debt, this is Jeff Rohner's, and I know you are not getting along. Do not speak to him yourself. I will handle this. I can convince him to take over the rest of this loan." And that's when I signed calling [my attorney] off.

DeShaw did not hear anything from the bank for a few months; then the bank resumed sending him foreclosure notices. DeShaw returned to attorney Riley to discuss the matter

**2014 Sale of Farm.** DeShaw eventually sold the farm for $150,000. After paying a 7% realtor's fee, DeShaw applied the remaining proceeds to his notes, reducing his debt to $30,000. At trial, White claimed he had told DeShaw that if he accepted the offer, "there is a $30,000 shortfall." White believed DeShaw's net proceeds were lower than they could have been because DeShaw allowed his realtor to charge a high commission. White also testified DeShaw "got a check for $139, and we paid the farm off, we applied the balance to the house" on Colesburg Road.

Rohner testified DeShaw's sale of the farm before Rohner filed for bankruptcy ended their September 2011 oral agreement for Rohner to rebuy half of the farm. At that point, Rohner decided DeShaw no longer owed him any money, even though Rohner had made the payments for almost two years—"why fight about it anymore, you know?"

**Litigation.** In April 2014, the bank sent a default notice to DeShaw, charging him accelerated default interest of 21%. DeShaw received similar notices until July 2014, when he filed suit against Rohner, White, and the bank for fraudulent misrepresentation and against White and the bank for fraudulent nondisclosure that the September 2011 loans placed a mortgage on his house. White and the bank answered and filed a compulsory counterclaim for foreclosure of the mortgage on DeShaw's Coleman Road property.

**Rohner's 2015 Bankruptcy**. In May 2015, Rohner filed for chapter 7 bankruptcy, listed DeShaw as an unsecured creditor with a $40,000 claim, and notified the district court in this matter of his bankruptcy petition.

28

Rohner had completed two other bankruptcies and had entered into reaffirmation agreements in his prior bankruptcies, including "a reaffirmation agreement to keep a tractor" he had financed through the bank. In his third bankruptcy, Rohner also signed a reaffirmation agreement with White on July 14, 2015, for $106,922; the bank retained a first mortgage on Rohner's home.[15] White explained: "For the reaffirmation all that was left was the house, because the rest of it was taken care of with the sale of the farm at fair value," i.e., the bank had used DeShaw's September 2011 purchase of the farm to pay off Rohner's commercial debts. In February 2016, Rohner filed a motion to dismiss, attaching the bankruptcy court's discharge and noting his motion did not affect any of the other defendants. The court dismissed Rohner.

**2016 Proceedings.** The district court held a jury trial over several days in November 2016. White asked the jury to find DeShaw in default on the note tied to his Colesburg Road home and to allow the bank to proceed with foreclosure. DeShaw called witnesses who corroborated his interest in purchasing the Elkader HVAC business and who observed Rohner's use of the farm did not change and DeShaw never acted as though he owned the property.

The jury was instructed on "Affirmative Defense—Excused Performance," stating DeShaw's "failure to make payments on the Note may be excused if the Note was procured by fraudulent misrepresentation or nondisclosure." If DeShaw proved *one or both* of those claims, then "the Farmers Savings Bank cannot

---

[15] White testified Rohner would have lost $60,000 in home equity if he had not reaffirmed. Similarly, Rohner testified, if he hadn't signed that agreement, he would have "lost the house and moved."

recover on its note." On November 18, 2016, the jury returned a verdict in DeShaw's favor. Three days later, the court entered judgments in favor of DeShaw and against White, noting "[n]o money judgment is entered against any party on any of the claims." Also on November 21, White filed a motion for judgment notwithstanding the verdict. DeShaw resisted. The district court set the matter for a December hearing. But before the hearing, White filed a notice of appeal. The district court declined to rule on the motions because it "lost jurisdiction." We turn to the appeal.

## II. Scope and Standard of Review

A district court directs a verdict "only if there was no substantial evidence to support the elements of the plaintiff's claim." *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5 (Iowa 2009) (citation omitted). Where reasonable minds would accept the evidence as adequate to reach the same findings as the factfinder, the evidence is substantial. *Pavone v. Kirke*, 801 N.W.2d 477, 487 (Iowa 2011). Further, "[w]here reasonable minds could differ on an issue, directed verdict is improper and the case must go to the jury." *Id.* (citation omitted).

We review the district court's ruling on White's motion for directed verdict for correction of errors at law. *See id.* On appeal, we resolve whether the district court correctly ruled "there was substantial evidence to submit the issue to the jury." *Id.* In our analysis we consider "all reasonable inferences" the jury could fairly make and "must view the evidence in the light most favorable to the nonmoving party," here, DeShaw. *Id.*

### III.    Fraudulent Misrepresentation

For fraudulent misrepresentation, DeShaw had to prove by a preponderance of clear, satisfactory, and convincing evidence the following elements:

> 1.    Jeff Rohner, prior to September 11, 2011, made representations to Marty DeShaw that Farmers Savings Bank would foreclose on Rohner's farm, transfer the farm to DeShaw, Rohner would make payments on the loan, take bankruptcy to discharge the judgments, and have the property transferred back to Rohner.
> 2.    White and Farmers Savings Bank aided and abetted Jeff Rohner . . . .
> 3.    The representation was false at the time it was made.
> 4.    The representation was material.
> 5.    Jeff Rohner knew the representation was false when he made it.
> 6.    Jeff Rohner intended to deceive Marty DeShaw.
> 7.    Marty DeShaw acted in reliance on the truth of the representation and was justified in relying on the representation.
> 8.    The representation was a proximate cause of Marty DeShaw's damages.

On appeal, White challenges the first, second and sixth elements.[16]

---

[16] In addition to these elements, White also broadly challenges on appeal the fifth element. White must raise error with some specificity in a directed verdict motion. *See Pavone*, 801 N.W.2d at 487. White's first motion for directed verdict argued two grounds: (1) DeShaw failed to prove Rohner intended to deceive DeShaw when Rohner promised to go into bankruptcy and make payments and (2) DeShaw failed to prove White's "fraud in the inducement to get Mr. DeShaw to skip reading those documents." The court denied the motion. At the close of the evidence, White renewed his motion on the first two grounds and raised a new ground: "[N]o substantial evidence exists . . . White knew of any fraudulent intent by [Rohner] if it indeed existed." Because White did not challenge the fifth element at trial and because our appellate review is limited to those grounds raised in White's motion, we will not address the issue on appeal. *See id.*

**A.    Did the record include substantial evidence Rohner intended to deceive DeShaw?**

White argues Rohner had no motivation to induce his friend, DeShaw, to buy the farm because Rohner's real-estate debts were satisfied in the nonjudicial foreclosure.  White claims the only "potential evidence" suggesting Rohner made representations with an intent to deceive was testimony Rohner "did not immediately file bankruptcy" and "did not continue to make all the payments on the property."  According to White, the evidence Rohner *did make* payments for about two years and *eventually* did file bankruptcy makes it "equally probable" Rohner intended to follow through with the promises" to DeShaw "when he made them," but "later changed his mind or was unable to perform."  White concludes the fact finder cannot infer fraudulent intent from Rohner's actions under the "clear, satisfactory, and convincing" evidence standard.

The instructions defined "a representation" as "any word or conduct asserting the existence of a fact."  Under this definition, a representation of fact includes "an opinion expressed for the deliberate purpose of deceiving another" and "a promise to perform a future act."  The instructions defined "intent to deceive" as follows:

> Jeff Rohner intended to deceive Marty DeShaw if any of the following situations existed when he made a representation:
>     1.  Jeff Rohner wanted to deceive Marty DeShaw or believed that Marty DeShaw would in all likelihood be deceived.
>     2.  Jeff Rohner had information from which a reasonable person would conclude that Marty DeShaw would be deceived.
>     3.  Jeff Rohner made the representation without concern for the truth.

The elements of fraud "are seldom susceptible to direct proof and may be proven by circumstantial evidence." *Kunkle Water & Elec., Inc. v. City of Prescott*, 347 N.W.2d 648, 653 (Iowa 1984). From the circumstantial evidence at trial detailed above, a reasonable jury could conclude the following: Rohner intended DeShaw's debt-free Colesburg Road house be the security for DeShaw's purchase of Rohner's farm, as discussed solely by Rohner and White on January 8, 2011. Rohner then convinced DeShaw he should deliver the Colesburg Road abstract to White by falsely telling DeShaw (1) Rohner had spoken with White on DeShaw's behalf and (2) White agreed to finance DeShaw's purchase of the Elkader HVAC business. After DeShaw delivered the Colesburg Road abstract, Rohner intentionally sidetracked any further discussions of DeShaw's purchase of the Elkader business, knowing DeShaw could not move forward without using Rohner's existing HVAC licenses.

A reasonable jury could have found Rohner told DeShaw he needed help for only a few months on his March 2011 interest payments for the farm and then Rohner would repay DeShaw's loan. But Rohner did not pay off this loan on its June 30, 2011 due date and did not tell DeShaw of his inaction because (1) Rohner never intended or recklessly asserted he would make the payment and (2) Rohner's default would likely affect DeShaw's willingness to go forward with the larger September 2011 loans Rohner wanted DeShaw to complete.

Although DeShaw eventually decided to help Rohner in September 2011, the jury could have reasonably determined Rohner did not take bankruptcy immediately, even though he was familiar with the process, because Rohner never intended to do so. Rohner understood the cash flow from his new business would

not let him keep the farm, or as Rohner testified, even one-half of the farm. Rohner's motive for involving DeShaw was his belief DeShaw, who Rohner was helping to learn a new trade, would continue to allow Rohner and his family extended use of the farm, which happened, and DeShaw would therefore help Rohner postpone the inevitable—lack of access to the recreational timber that long had been in his family.

Rohner also intended to deceive DeShaw because he knew—based on Rohner's familiarity with bankruptcy and reaffirmation agreements—Rohner had no ability "to have the property transferred back" as any such transfer would be determined solely by the bank's determination of Rohner's credit and not based on Rohner's wishes. Rohner also knew he had been "chronically past due" on his debt obligations to the bank since 2008. "A misrepresentation may occur when one with superior knowledge, dealing with inexperienced persons who rely on him or her, purposely suppresses the truth respecting a material fact involved in the transaction." *Id.*

Reviewing the record as a whole in the light most favorable to DeShaw and taking into consideration all reasonable inferences that could be fairly made by the jury, we find no error in the district court's denial of the directed verdict. The jury heard differing versions of the events from White and Rohner and, being aware of their biases, ultimately did not believe them on key points. We will not disturb the jury's determination Rohner and White were less credible witnesses than DeShaw. *See State v. Morgan*, 877 N.W.2d 133, 138-39 (Iowa Ct. App. 2016) (noting it is the "very function of the jury" to determine witness credibility and the jury is free to believe or disbelieve any testimony as it chooses).

**B.	Did the record include substantial evidence White knew of Rohner's fraudulent intent?**

For White to be liable for Rohner's actions by aiding and abetting, DeShaw had to prove by a preponderance of clear, satisfactory, and convincing evidence all of the following: (1) Rohner made fraudulent representations; (2) White knew of Rohner's fraudulent representations; and (3) White gave substantial assistance or encouragement to Rohner in the making of fraudulent misrepresentations. The jury instructions defined "knowledge of falsity" as, "White actually knew or believed the representation was false."

On appeal, White challenges the second element,[17] pointing out DeShaw did not offer evidence of conversations or other communications between White and Rohner discussing a fraudulent scheme. According to White, the court erred in not directing verdict on that ground. As outlined above, we can look to circumstantial evidence to establish the elements of fraud.

A reasonable jury could find White and Rohner worked closely together since 2007—White loaned money to Rohner so he could keep the farm and start a new business. The jurors, who observed the demeanor of all three men, could credit DeShaw's testimony he did not attend the January 8, 2011 meeting. Instead, Rohner and White discussed DeShaw being an investor, White looked up the appraised value of DeShaw's Colesburg Road house, and White assisted Rohner by having Lange draw up a contract for Rohner's proposal. The jurors could decide

---

[17] White also contends on appeal DeShaw did not offer substantial evidence White "substantially assisted" in a fraud perpetrated by Rohner. Because White did not challenge the third element at trial, we will not address the issue on appeal.

White met DeShaw for the first time in September 2011 and White intentionally backdated DeShaw's credit application to create a "paper trial" showing why DeShaw had delivered his Colesburg Road abstract to the bank in February, even though White admitted DeShaw expressed concern about using the house as security and becoming "homeless."

While White tried to convince the jury he erred in his deposition testimony that indicated White knew the September 2011 transaction was really Rohner's loan going past due, a reasonable jury could credit his deposition testimony and ignore White's excuses at trial. Further, jurors could justifiably wonder why White would talk to Rohner about making payments on a loan White claimed was solely DeShaw's obligation. The jury could also note White failed to present any documents supporting his trial claim that the loan payments came from DeShaw's account. Also, White told DeShaw that White knew this was Rohner's loan when DeShaw sought legal advice on paying the $30,000 deficiency.

The jury's verdict is supported by DeShaw's description of Rohner and White hatching a "plan" together: Rohner "had discussed it with Mark White, and they came up with the idea." A jury could also reasonably infer White knew of Rohner's fraudulent representations because White intentionally withheld notices from DeShaw in July, August, and September 2011 that would inform DeShaw, in fact, Rohner had not paid off the smaller March 2011 loan. White's inaction thus foreclosed potential questions from DeShaw before DeShaw moved forward with a much larger transaction in September 2011. The circumstantial evidence of White's knowledge of Rohner's misrepresentations also arises from White's evasive cross-examination testimony on clearing title to Colesburg Road, and his

incredible testimony he did not know Lange had asked him to get a sworn affidavit from DeShaw before closing the larger loan.

Finally, the bank would profit from Rohner's misrepresentations as DeShaw's loans cleared about $120,000 of Rohner's farm debt, and the $27,000 excess White "gave to [Rohner]"—his troubled debtor. In return, the bank gained a new lien on the farm from a debtor with good credit, as well as a first mortgage on the Colesburg Road house that DeShaw had told White he would not use for collateral for any farm transaction. We find substantial evidence in the record to support the jury's verdict.

## IV.   Fraudulent Nondisclosure

DeShaw had to prove all of the following elements "by a preponderance of clear, satisfactory, and convincing evidence" for his fraudulent-nondisclosure claim against White:

> 1. Special circumstances existed which gave rise to a duty of disclosure between Marty DeShaw and Mark White on behalf of [the bank].
> 2. While such relationship existed, Mark White . . . knew Marty DeShaw would be signing a mortgage on his homestead.
> 3. While such relationship existed, Mark White . . . concealed or failed to disclose that Marty DeShaw would be signing a mortgage on his homestead.
> 4. The undisclosed information was material to the transaction.
> 5. Mark White . . . knowingly failed to make the disclosure.
> 6. Mark White . . . intended to deceive Marty DeShaw by withholding such information.
> 7. Marty DeShaw acted in reliance upon [Mark White's] failure to disclose and was justified in such reliance.
> 8. The failure to disclose was a cause of Marty DeShaw's damage.

On appeal, White challenges only the third element. He argues, "while fraudulent misrepresentation may excuse" DeShaw "from being charged with

knowledge of the contents of the promissory note and mortgage documents, the fact that the disclosure was expressly made in writing" to DeShaw "is not changed as a result. In other words," DeShaw's "failure to read the documents does not mean that the bank did not attempt to make such disclosures in writing."

First, White waived this argument by failing to cite any supporting authority. *See* Iowa R. App. P. 6.903(2)(g)(3). Second, even if not waived, this argument is without merit. White testified he discussed the mortgage on Colesburg Road with DeShaw in detail at the loan closing. DeShaw testified White did not. The jury resolved the issue, and as discussed above, the jury had good reasons to discount White's testimony and credit DeShaw's testimony.

## V. Conclusion.

The district court properly submitted DeShaw's claims of fraudulent misrepresentation and fraudulent nondisclosure to the jury. The record included substantial evidence to support the jury's findings on the challenged elements.

**AFFIRMED.**